PULLMAN'S PALACE CAR COMPANY *v.* METROPOLITAN STREET RAILWAY COMPANY.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF MISSOURI.

No. 146.  Argued January 11, 14, 1895. — Decided March 4, 1895.

In June, 1887, the Pullman Car Company of Chicago wrote to the Metropolitan Street Railway Company of Kansas City, proposing to build for it 25 cable cars according to specifications attached, and to deliver them free on board the Pullman Junction in Illinois, the cars to be inspected and accepted at the Pullman works, and to be paid for on delivery, the written acceptance of the railway company to constitute a contract mutually binding. Nothing was said about brakes except that they were to be operated by gripmen with lever, both trucks. The railway company accepted in writing. The details of construction were then considered and agreed upon between the two companies. Nothing further was said about brakes except that the railway company required them to be heavy and extra powerful. Brakes were then designed by the car company, but no designs of them were furnished to the railway company. When 12 cars were finished, but before any had been delivered, the agent of the railway company went, at the request of the car company, to the shops of the latter in Illinois, and there made a thorough examination of the 12 cars, working the brakes and carefully watching their operation. He expressed himself entirely satisfied with them, and ordered the others to be finished in the same way, and all to be forwarded. This

was done in five shipments between February 24 and March 30, 1888. Before the last shipment was made the railway company, on the 23d of March, tried the cars and found that the brakes would not work satisfactorily. They notified the car company at once, and it sent its engineer to Kansas City. When he left Kansas City he claimed that he had remedied the trouble. On the 5th of April the car company presented its bill for payment. On the 11th the railway company declined to pay it unless the brakes were first made right, and asked the car company to send a man to make the necessary changes, adding that if this were not done it would make the changes itself and charge the car company with the expense of them. The car company did send a man, who worked upon the brakes for some time, but without remedying the difficulty. On the 12th of May the railway company declined to accept the cars, and so notified the car company. It stored the 25 cars in Kansas City, and ordered a supply of cars elsewhere. The car company thereupon sued the railway company, to recover the contract price for the cars. *Held*,

(1) That the title to the first 12 cars passed to the railway company when its agent inspected and accepted them at the shops of the car company;

(2) That the title to the remainder passed to the railway company when they were put on cars at Pullman Junction, to be forwarded to that company;

(3) That under the circumstances the most that the railway company could claim was the reasonable cost of obtaining new brakes adapted for use on the cars constructed under the contract.

THE case, as stated by the court, was as follows:

This action was brought by the Pullman Palace Car Company to recover from the Metropolitan Street Railway Company the sum of $54,219.70 with interest from March 14, 1888, alleged to be due to it under a certain contract for the construction of cars for the defendant company.

The principal defence was that the defendant rightfully rescinded the contract and tendered the cars back to the plaintiff, which refused to receive them, and that after such rescission and refusal the defendant company stored the cars in a proper place, subject to the order of the plaintiff. The defendant also, by way of counter-claim, sought damages against the plaintiff for failure to perform the contract.

The action arose out of certain facts set forth in a special finding by the court below. Those facts were substantially as follows:

Prior to May 15, 1887, the Metropolitan Street Railway Company, a corporation of Missouri, was engaged in the construction of a double track railway on certain streets in Kansas City. The maximum grade of its line was thirteen and fourteen feet ascent in a distance of one hundred feet. There were a number of grades on the line running up to ten per cent and also numerous sharp curves.

On the 15th of May, 1887, the defendant's roadbed having been constructed and the tracks laid, its chief engineers wrote to Charles Pullman, the general agent of the Pullman Palace Car Company, at Pullman, Illinois: "We write to say that we are now ready to take cars for our Wyandotte and Twelfth-Street lines, and should be glad to have you call on us at your convenience." Upon receiving this letter Pullman, who had a general knowledge of the grades and curves of the defendant's line, went to Kansas City to discuss the proposed contract. From Kansas City he went to Chicago, and from the latter place, under date of June 21, 1887, sent to the president of the defendant company a letter written by the general manager of the plaintiff, under date of June 21, 1887, as follows: "I beg to enclose herewith contract with specifications attached, executed by me in duplicate, for the building of twenty-five combination closed and open street cars for your company. Kindly sign and return to me one copy of contract for our files. You will notice in the specifications that the space for the lettering has been left blank, and I would be glad if you would indicate on the specifications returned the lettering you desire applied to the cars."

The contract referred to in that letter was in these words: "Pullman's Palace Car Company will build for the Metropolitan Street Railway Company twenty-five combination closed and open cable cars, as per general specifications hereto attached and made a part of this agreement, and deliver the same f. o. b. [free on board] Pullman Junction, Kensington, Ill., on or before October 10, 1887, delays by fires, strikes, and unavoidable hindrances excepted, for the sum of two thousand dollars each. Terms, cash on deliveries. Cars to be inspected and accepted at our works. Your written acceptance hereof

will constitute a contract mutually binding upon both companies." To this contract were appended the above general specifications. These specifications called for cars in length 34' 9" "over all," in width 6' 6" or more over sides. They contained nothing relating to brakes except the following: "Brakes to be operated by gripmen, with lever, both trucks."

On the 27th of June, 1887, defendant's chief engineers wrote to the plaintiff as follows: "Your letter of the 21st, enclosing contracts and specifications in duplicate for the twenty-five combination cars for our Twelfth-Street line, addressed to our president, Morse, has been referred to us for attention in his absence, and we enclose you with this one copy duly executed by us on behalf of the company. Will you kindly advise about when we may expect to get the general plans which Mr. Pullman, when here, promised to let us have."

Between the 1st and 16th of July, 1887, the plaintiff's engineer, Twyman, visited Kansas City, stating that the general purpose of his visit was to determine upon the general features of the cars, the shortest curve and other physical conditions of the road, the radius of the shortest curve a car would have to go around, and to arrange with reference to the outside width and the extra length over all, the relative position of the trucks, the height of the wheels, the steps and the seats, and the distance between the seats, etc. He was at the office of the defendant for some time, had access to the plans and profiles of the road, and while in Kansas City certain specifications were approved by defendant's engineers and were submitted to him. These specifications increased the length of cars to 38 feet "over all," and prescribed their width, width of floor frame, height from top of track to top of floor, distance between centre of trucks, wheel base of truck, distance from front of car to centre of forward truck, length of close part of car, length of open portion, as well as of rear platform, size of wheels and sixteen cross-seats to be fixed as decided.

The plaintiff then proceeded with the work of construction. The defendant gave no direction in relation to the brakes on the cars otherwise than that they should be extra heavy and extra powerful; nor were any plans or specifications for brakes

furnished to the defendant during their construction. The brake put upon the cars was designed and constructed by Twyman, plaintiff's engineer.

In December, 1887, in response to plaintiff's request that defendant send one of its employés to Pullman to inspect the cars, Lawless, defendant's superintendent, went there for that purpose. Ten or twelve cars were then shown to him as completed and standing in the shops of plaintiff on the floor where they were run out. Lawless made a thorough examination of them, inside and out, and upon examining the brakes by having them worked from within, and observing their operation and application while under and at the side of the car, announced himself as satisfied with them, and requested the representative of the plaintiff present to finish the others up in the same way and forward them. No further request was made by Lawless for testing the cars, and no other facilities were offered by the plaintiff for making such test and examination.

The first five cars were shipped by plaintiff February 24, 1888. The next shipment, of eight cars, was on March 1, 1888; the next, of two cars, March 17, 1888. Five cars were shipped March 27, 1888, and the remainder on the 30th day of March, 1888.

When the cars reached Kansas City, they were stored in defendant's power-house, because the eastern extension of its line was not then in readiness for operation. They were taken into the house by passing them over a curved track from the street. This curve was 30-foot radius. When the first lot of cars were being passed around this curve it was found that the wheels "bound against the sills." Thereupon defendant's engineer telegraphed plaintiff as follows: "Forward truck of cars will not pass around 30-foot radius curve. Lengthen stay-chains and cut away lower corner of middle sills." To this telegram, plaintiff answered: "Telegram received. Will make alterations requested."

On the 22d of March, 1888, before all the cars had been shipped, the east end of the Twelfth-Street line was completed so that a car could run over that part of the line. Defendant's

superintendent took out one of the cars for trial, when difficulty about the brakes manifested itself. The difficulty was that when the brakes were so adjusted that they could be used to stop the car on a straight level track, in passing around a curve or up a grade they would bind against the wheels, causing them to slip, and at times throwing the car from the track. If the brakes were so adjusted that they would not bind on the curves or grades, then they would not work on a straight, level track so as to stop the cars.

On the 23d of March the defendant, by its superintendent, wrote to the general manager of the plaintiff: " We tried one of your cars over the line yesterday and found that the brakes would not work satisfactorily ; in fact, were perfectly useless. I think the reasons for this are : There being so many connections, and consequently so much lost motion, that before the shoes hug the wheels the break-lever comes to the limit of the quadrant. Before starting out with the car we adjusted the brakes so that the shoes touched the wheels, but notwithstanding this we could not lock the wheels, or even hold the cars on the lightest grades. As a perfect working brake is an imperative matter with us, I would like to hear from you on the subject and what remedy you propose."

In response to this letter Twyman, the plaintiff's engineer, came at once to Kansas City and attempted to remedy the trouble with the brake, and on leaving claimed that he had done so.

On the 5th of April, 1888, the manager of the plaintiff wrote to the defendant's president : " The entire lot of twenty-five cars have been delivered, thirteen of them having been shipped in February. Bills have been rendered your company for the amount of $50,000, being the original contract price without extras, bills for which will be sent your auditor in a few days. Will you kindly direct a prompt remittance for the bills already rendered ? "

The defendant's whole line was ready to be opened on or about the 7th or 10th day of April, 1888, when the cars for the first time were placed on its road. This was shortly after Mr. Twyman had left Kansas City.

Upon the recurrence of the trouble in operating the cars, the defendant, under date of April 11, 1888, wrote to plaintiff: " I have delayed answering your letter of April 5th for some days, as I wished to see your cars in practical operation before making a reply. The Twelfth-Street cable line has been running since Saturday, and we should now be operating with a full equipment if we had not been obliged to make constant repairs and changes to the car brakes. These are very unsatisfactory, and we have hardly been able to make a round trip with a car without stopping to make repairs, and on several occasions have been obliged to run over a considerable portion of the line with no power to set the brakes. I will make no attempt to go into this matter in detail, but wish to say that I shall insist on these cars being made right in this respect before I should be willing to approve your bills. If you will send a practical man here to take charge of these necessary changes it will be the best plan, *otherwise we shall be obliged to make them and charge you with the expense.* There are some other things about the cars which are not as they should be, *but which do not interfere with the operation of them.* Many of the panels are badly cracked, and the painting on part of the cars at least is very poorly done. The attention of your engineer was called to these points, and he admitted that the work was not as it should be. I have no desire to delay the settlement of your bills, and would gladly approve your vouchers for them to-day if we could use the cars, as it is costing the company a very large amount of money every day that we cannot operate with a full equipment. Let me hear from you in regard to what action you will take as to the brake repairs at your earliest convenience."

To this letter the plaintiff, under the date of April 13, 1888, replied: " Your favor of the 11th instant received and noted. I regret to hear that you are having any further trouble with the brakes on the combination cars, as our engineer reported on his return that the trial made on the brakes on one of the cars while he was there, after some slight changes had been made, proved entirely satisfactory, and there was every reason to suppose that with these little changes the brakes

would work well on the remaining cars.  I regret that your engineer or superintendent did not wire us of the situation as indicated in your letter, as we would have sent our engineer over immediately.  As it is, he will leave for Kansas City to-night, and I trust that, in conjunction with your people, the defects reported can be easily remedied.  Our engineer did report on his return that the paint was acting badly on a portion of the new cars, and we are sending out two experienced men to attend to the paint work on such of the cars as require it.  It is proper to explain just here that the defect seems to be with the middle panel, which is painted with what is called 'crimson lake,' and which is one of the most difficult colors to hold.  We regret exceedingly that there has been any trouble in this regard, and you may rest assured that the defects will be remedied without expense to your company.  Speaking of the paint reminds me that our people report that the alkali water is very severe on the finish of your cars, as we know from our own experience with sleeping cars where alkali water is used.  Another suggestion in this connection I beg to make is that, if your people would take the new cars in shop within about four or five months after they are received and give the paint a thorough cleaning, and then two coats of varnish, they would run for at least a year without having to be varnished again, and it would also preserve the life of the paint."

Immediately thereafter the plaintiff's engineer, Twyman, came to Kansas City to look after the trouble in question, and did some work on the brakes while there, but, being called away by letter or telegram, he left for Chicago, stating that he would soon return and complete the work. Instead of so doing he wrote a letter, saying: "I am sorry not to be able to return to Kansas City as quickly as I anticipated.  We have, however, arranged to send you a man immediately, *who will take charge of the necessary alterations of your cars.*  There will be no necessity of his leaving Kansas City *until everything is arranged to your satisfaction,* and I will probably come out there again towards the end of the week."

Immediately following this letter the plaintiff's mechanic, one Overton, came with typewritten instructions from Twyman, and went to work to remedy the defect in the brakes. He went over the cars one by one and pronounced them ready for service. This mechanic stated that he had done all he could do to remedy the difficulty in question, and if it did not accomplish that end he did not know how to remedy it. Notwithstanding the work and effort of this mechanic the same difficulty thereafter continued to manifest itself in the operation of the cars as to the working of the brakes.

The defendant's president then wrote to the plaintiff under date of May, 12 1888: "I have delayed corresponding with you further in regard to the Twelfth-Street cars until your mechanic had finished his work. The result of this work has been very little material improvement in the action of the brakes, and the cars at no time during the progress of the repairs have been in a satisfactory condition to operate, and not in such condition now. This fact has been reported to the board of directors, which has to-day passed a resolution rejecting the twenty-five cars furnished by your company for Twelfth Street on account of the imperfect brakes and other seriously objectionable features, and has instructed me to notify you to this effect, and that the cars are subject to your order."

To this letter the plaintiff replied, under date of May 17, 1888: "Your letter of the 12th instant, relating to the twenty-five combination cars built by this company for your company, has been received and noted. You are cognizant of the fact that the cars were built according to plans approved by your chief engineer, the material used, as well as the workmanship, being first class in all respects. The cars before shipment were inspected and accepted by your general superintendent. The cars were then shipped to, received, and put in use by you. Subsequently you made complaint that the brakes did not in all respects work satisfactorily, and a competent mechanic was promptly sent to examine the brakes and make any adjustment found necessary. When the brakes were examined and adjusted on one car your officers pronounced them satisfactory; thereupon the brakes were in like manner

examined and adjusted on the remaining cars, all the cars then being in use by your company. In view of the facts your present statement to the effect that you reject the cars on account of 'imperfect brakes and other seriously objectionable features' is quite astonishing, and I must assume that you have been misinformed as to the condition of the cars, as I am unwilling to believe that you would knowingly allow yourself to be a party to such an unreasonable and unfounded claim. I have to request, therefore, that you will without further delay remit the amount due this company for said cars, as per bills heretofore rendered, and thus avoid the necessity of any action on our part to enforce the payment of the amount due us."

The following additional facts were found by the court:

"The cars could not be operated successfully on defendant's railroad track for which they were designed with this brake, nor upon similar lines, and this defect or inability in the brake was not apparent nor discoverable upon any reasonable inspection made at the place of their manufacture, and could not be discovered without a practical test on the defendant's railroad track or over a like track. The defect in the brake was a latent one, which did not and could not develop to the observation on inspection, and was only discoverable when put into use on the defendant's track or similar track.

"The defendant paid the freight and drayage on said cars from Chicago to Kansas City the sum of $1088.50, and paid for building house in which to store the rejected cars $1850.

"After the sending of the letter by defendant's president to the plaintiff informing it that the cars were rejected and were at plaintiff's disposal, the defendant built a car-house at or near Kansas City and stored therein these cars, where they have ever since remained.

"The defendant operated upon its said road combination cars of a similar character, weighing about six hundred pounds less than the cars in controversy, which were manufactured by the Laclede Car Company of St. Louis, Missouri, and were operated by a brake of a different pattern, costing from seventy-five to one hundred dollars apiece.

"The defendant did not use and operate the cars in question longer than was reasonably necessary to ascertain whether they could be successfully operated with the brake furnished therewith.

"During the time defendant run the cars on its road, during the tests made, as hereinbefore found, passengers were received thereon and fares collected from them by defendant. The successful running of the trains was frequently interrupted by breaking of the cable and the locking of the car wheels, in consequence of the defective construction of the brakes, and defendant so continued in the attempt to run said cars during the time of plaintiff's promises to repair the alleged defect, and on such trips received on board of said cars passengers, and collected from them the customary fare. On the trial defendant offered to prove that owing to the insufficiency of the brakes the cars were run at a loss, and that no profit resulted from collection of fares. On plaintiff's objection this testimony was by the court excluded.

"Defendant had in its employ during the time in question two engineers of skill and experience, one of whom, Mr. Lawless, the same person who went to Chicago to inspect the cars at plaintiff's yards, had experience in the construction and practical operation of cable cars in San Francisco, California, prior to the time of taking service from defendant."

Upon the foregoing facts the court on its own motion declared the law to be that the defendant had the legal right to rescind the contract for the purchase of said cars in the time and manner above set out, and that the defendant rescinded the contract in accordance with its legal right so to do, made a lawful tender of the cars to the plaintiff, and was not liable for the contract price of them, or any other sum, and that the defendant was entitled to recover from the said plaintiff the freight and drayage on said cars from Chicago to Kansas City, amounting to the sum of $1088.50, for which judgment was entered.

*Mr. Gardiner Lathrop* for plaintiff in error. *Mr. John S. Runnells* and *Mr. William Burry* were on his brief.

*Mr. Frank Hagerman* and *Mr. Wallace Pratt* for defendant in error.

I. For all the purposes of review in this court the facts as found and stated by the court below are conclusive. Rev. Stat. § 649; *Boogher* v. *Ins. Co.*, 103 U. S. 90; *Dickinson* v. *Planters' Bank*, 16 Wall. 250; *Town of Ohio* v. *Marcy*, 18 Wall. 552; *Saulet* v. *Shepherd*, 4 Wall. 502; *Copelin* v. *Ins. Co.*, 9 Wall. 461; *Ins. Co.* v. *Folsom*, 18 Wall. 237; *Ins. Co.* v. *Sea*, 21 Wall. 158; *United States* v. *Dawson*, 101 U. S. 569; *Tyng* v. *Grinnell*, 92 U. S. 467; *Martinton* v. *Fairbanks*, 112 U. S. 670; *Fort Worth City Co.* v. *Smith Bridge Co.*, 151 U. S. 294.

II. No rulings having been made by the court below and excepted to upon objections to the admission or exclusion of evidence, the only question for review by this court is as to the sufficiency of the facts found to support the judgment. Rev. Stat. § 700; *Boogher* v. *Ins. Co.*, 103 U. S. 90.

III. There was an implied warranty on the part of the plaintiff that the cars, when manufactured and applied to the use contemplated by defendant and understood by plaintiff at the time of making the contract, should be reasonably fit for that use. *Kellogg Bridge Co.* v. *Hamilton*, 110 U. S. 108, and cases cited; *Railroad Co.* v. *Smith*, 21 Wall. 255; *Reynolds* v. *Palmer*, 21 Fed. Rep. 433; *Craver* v. *Hornburg*, 26 Kansas, 94; *Curtis Mfg. Co.* v. *Williams*, 48 Arkansas, 325; *Rodgers* v. *Niles*, 11 Ohio St. 48; *S. C.* 78 Am. Dec. 290; *Best* v. *Flint*, 58 Vermont, 543; *Downing* v. *Dearborn*, 77 Maine, 457; *Brigg* v. *Hilton*, 99 N. Y. 517; *Hoult* v. *Baldwin*, 67 California, 440, 610; *Beals* v. *Olmstead*, 24 Vermont, 114; *S. C.* 58 Am. Dec. 170; *Correio* v. *Lynch*, 65 California, 273.

IV. The provision in the contract for an inspection and acceptance of the cars at works of the plaintiff does not apply to defects discoverable only by actual use. (*a*) It is the only just and reasonable construction that can be given to the contract. (*b*) It is the construction placed upon the contract by the parties themselves. *Chicago* v. *Sheldon*, 9 Wall. 50; *Foster* v. *Goldschmidt*, 21 Fed. Rep. 70.

V. Even if we are wrong in our construction of the contract,

yet the fact that the contract provided for an inspection at the works does not exclude the implied warranty of the manufacturer if the defect was only discoverable by use on the Twelfth-Street line. *Heilbutt* v. *Hickson*, L. R. 7 C. P. 438; *Bird* v. *Smith*, L. R. 12 Q. B. 786; *Craver* v. *Hornburg*, 26 Kansas, 94; *Kellogg Bridge Co.* v. *Hamilton*, 110 U. S. 108; *Boothby* v. *Scales*, 27 Wisconsin, 626; *Hudson* v. *Roos*, 72 Michigan, 363; *Gould* v. *Stein*, 149 Mass. 570.

VI. The fact that the work was done under specifications does not exclude the idea of an implied warranty.

VII. For a breach of the implied warranty the defendant, within a reasonable time, could elect to rescind the contract. *Craver* v. *Hornburg*, 26 Kansas, 94; *Weybrich* v. *Harris*, 31 Kansas, 92; *Branson* v. *Turner*, 77 Missouri, 489; *Howe Machine Co.* v. *Rosine*, 87 Illinois, 105; *Rogers* v. *Hanson*, 35 Iowa, 283; *Morse* v. *Brackett*, 98 Mass. 205; *Hyatt* v. *Boyle*, 5 Gill. & Johns. 110; *S. C.* 25 Am. Dec. 276; *Marston* v. *Knight*, 29 Maine, 341; *Dill* v. *O'Ferrell*, 45 Indiana, 268; *Butler* v. *Northumberland*, 50 N. H. 33; *Youghiogheny Iron Co.* v. *Smith*, 66 Penn. St. 340; *Jagers* v. *Guffin*, 43 Mississippi, 134; *Ralph* v. *Chicago & Northwestern Railway*, 32 Wisconsin, 177; *Curtis Mfg. Co.* v. *Williams*, 48 Arkansas, 325; *Hoult* v. *Baldwin*, 67 California, 610; *Polheumus* v. *Herman*, 45 California, 573; *Downing* v. *Dearborn*, 77 Maine, 457; *Correio* v. *Lynch*, 65 California, 273; *Mandel* v. *Buttles*, 21 Minnesota, 391; *Prickett* v. *McFadden*, 8 Ill. App. 197; *Matthews* v. *Fuller*, 8 Ill. App. 529; *Kent* v. *Bornstein*, 12 Allen, 342; *Culler* v. *Gilbreth*, 53 Maine, 176; *Jack* v. *R. R. Co.*, 53 Iowa, 399; *National Bank & Loan Co.* v. *Dunn*, 106 Indiana, 110; *Warder* v. *Fisher*, 48 Wisconsin, 338; *Scranton* v. *Tilley*, 16 Texas, 183; *Pope* v. *Allis*, 115 U. S. 363.

VIII. The non-compliance with a condition of a contract will always authorize a rescission. *Fogg* v. *Rodgers*, 84 Kentucky, 558; *Wolcott* v. *Mount*, 36 N. J. Law, 262; *Bagley* v. *Cleveland Rolling Mill Co.*, 21 Fed. Rep. 159; *Norrington* v. *Wright*, 115 U. S. 188; *Filley* v. *Pope*, 115 U. S. 213.

IX. Where an article is ordered from a manufacturer upon an executory contract, there is the implied warranty before

mentioned, and this is a condition of the contract which will warrant a rescission for a breach. *Howard* v. *Hoey*, 23 Wend. 350; *S. C.* 35 Am. Dec. 572; *Voorhees* v. *Earl*, 2 Hill, 288; *S. C.* 38 Am. Dec. 588; *Muller* v. *Eno*, 14 N. Y. 597; *Street* v. *Blay*, 2 B. & Ad. 456; *Heilbutt* v. *Hickson*, L. R. 7 C. P. 438; *Parks* v. *Morris Tool Co.*, 54 N. Y. 586; *Brigg* v. *Hilton*, 99 N. Y. 517; *Norton* v. *Dreyfuss*, 106 N. Y. 90. The distinction as to an implied warranty by a manufacturer upon an executory contract is too refined to be clearly drawn. *Bagley* v. *Cleveland Rolling Mill Co.*, 21 Fed. Rep. 159; *Wolcott* v. *Mount*, 36 N. J. Law, 262; *Pope* v. *Allis*, 115 U. S. 363.

X. The receipt of the cars does not prevent the return whether considered as a rescission on account of the breach of the warranty, or a rejection on account of a breach of a condition. *Norrington* v. *Wright*, 115 U. S. 188; *Craver* v. *Hornburg*, 26 Kansas, 94; *Branson* v. *Turner*, 77 Missouri, 489; *Boughton* v. *Standish*, 48 Vermont, 594; *Knoblauch* v. *Kronschnabel*, 18 Minnesota, 300; *Simpson* v. *Krumdick*, 28 Minnesota, 352; *Doane* v. *Dunham*, 79 Illinois, 131; *Hoult* v. *Baldwin*, 67 California, 610; *Curtis Mfg. Co.* v. *Williams*, 48 Arkansas, 325; *Dawes* v. *Peebles*, 6 Fed. Rep. 856; *Bryant* v. *Isburgh*, 13 Gray, 607; *S. C.* 74 Am. Dec. 655. Especially is the right to rescind or reject not lost when the failure so to do comes from the assurances of the vendor. *Courtney* v. *Boswell*, 65 Missouri, 196; *Day* v. *Pool*, 52 N. Y. 416; *Matthews* v. *Fuller*, 8 Ill. App. 529.

XI. A mere offer to return is a sufficient rescission. *Howard* v. *Hoey*, 23 Wend. 350; *S. C.* 35 Am. Dec. 572; *Grimoldby* v. *Wells*, L. R. 10 C. P. 391; *Curtis Mfg. Co.* v. *Williams*, 48 Arkansas, 325; *Matthews* v. *Fuller*, 8 Ill. App. 529; *Padden* v. *Marsh*, 34 Iowa, 522. And the vendor will be put *in statu quo* if the chattel is returned injured, if not injured by the buyer's negligence. 2 Kent Com. 480, note (*c*).

MR. JUSTICE HARLAN, after stating the case as above reported, delivered the opinion of the court.

The facts found by the court below, as above detailed, bring this case within a very narrow compass, and render it unneces-

sary to make an extended review of the very large number of adjudged cases, American and English, cited in argument.

The subject of implied warranty in sales of personal property was examined by this court in *Kellogg Bridge Company* v. *Hamilton,* 110 U. S. 108, 116, and, subsequently, in *Seitz* v. *Brewers' Refrigerating Co.,* 141 U. S. 510, 518. In the first of those cases it was said that " when the seller is the maker or manufacturer of the thing sold, the fair presumption is that he understood the process of its manufacture, and was cognizant of any latent defect caused by such process, and against which reasonable diligence might have guarded. This presumption is justified, in part, by the fact that the manufacturer or maker, by his occupation, holds himself out as competent to make articles reasonably adapted to the purposes for which such or similar articles are designed. When, therefore, the buyer has no opportunity to inspect the article, or when, from the situation, inspection is impracticable or useless, it is unreasonable to suppose that he bought on his own judgment, or that he did not rely on the judgment of the seller as to latent defects of which the latter, if he used due care, must have been informed during the process of manufacture. If the buyer relied, and under the circumstances had reason to rely, on the judgment of the seller, who was the manufacturer or maker of the article, the law implies a warranty that it is reasonably fit for the use for which it was designed, the seller at the time being informed of the purpose to devote it to that use." This principle was reaffirmed in the other case above cited and it was there said: " But it is also the rule, as expressed in the text-books and sustained by authority, that where a known, described, and definite article is ordered of a manufacturer, although it is stated by the purchaser to be required for a particular purpose, still, if the known, described and definite article be actually supplied, there is no warranty that it shall answer the particular purpose intended by the buyer."

These cases were much commented on in argument, and, for that reason, we have deemed it proper to indicate the principal ground upon which each was determined.

The present case has some features that were not in either

of the others. By the written contract between the parties the cars that the plaintiff agreed to construct were to be inspected and accepted at the works of the plaintiff, after which they were to be delivered by the plaintiff, free on board the cars, at Pullman Junction, Kensington, Illinois. After ten or twelve cars were completed, and were inspected at the works of the plaintiff by the superintendent of the defendant, the latter expressed himself satisfied with them, and requested the plaintiff to finish the others in the same way and forward them. Clearly, upon such inspection and acceptance, the title as to those cars passed to the defendant company. There is no claim that the remainder of the cars were not finished in the same manner as the first lot inspected by Lawless. As to these, the title certainly passed to the defendant when they were put on the cars at Pullman Junction to be forwarded, if it did not pass before and as each lot was completed under the order to make them like those that had been personally inspected and accepted at the works of the plaintiff. *Halliday* v. *Hamilton*, 11 Wall. 560, 564, and authorities cited; *The Mary and Susan*, 1 Wheat. 25, 35; *Stack* v. *Inglis*, 12 Q. B. D. 564.

To what extent was the defendant concluded by the actual inspection and acceptance of the first lot of cars, and of the acceptance, in advance of their completion, of the remaining cars when finished or constructed in the same way?

The court below found that the cars could not be operated successfully with the brakes that were put upon them by the plaintiff, and that this fact was not apparent nor discoverable upon any reasonable inspection at the place of manufacture, and could not be discovered until after a practical test upon the road.

The contention, therefore, of the defendant is that the plaintiff, having knowledge that the cars were to be used on the defendant's road, impliedly warranted that the brakes placed on them would be sufficient for the purposes for which they were designed. The plaintiff insists that the provision in the contract for inspection and acceptance of the cars at the place of manufacture is inconsistent with any idea of implied

warranty upon its part of the sufficiency of the brakes to meet the peculiar difficulties on defendant's road arising from curves and grades; especially as one of the defendant's engineers had experience in the construction and operation of street cars, and was at least as well informed upon that subject as the plaintiff's officers could possibly have been.

If it be assumed that the plaintiff, notwithstanding the provision for inspection and acceptance of the cars before their delivery, impliedly warranted the sufficiency of any brakes placed by it on cars to be used on the defendant's road, and even if it be assumed that the defendant had the right, after title passed, to rescind the contract within a reasonable time after discovering the insufficiency of the brakes, the result for which the defendant contends will by no means follow.

The defendant became aware of insufficiency of the brakes as early as the 22d day of March, 1888, and notice of that fact was given to the plaintiff. The defendant did not then rescind the contract nor intimate any purpose of so doing. It sought to know what remedy the plaintiff would suggest to meet the difficulty, and demanded that the plaintiff should make the brakes sufficient. It warned the plaintiff that if it did not send a practical man to Kansas City to take charge of the necessary changes, such changes would be made by the defendant at the plaintiff's expense. The latter promptly replied that it would do what was necessary in order to make the brakes sufficient. But what it did failed to accomplish the desired result. The outcome of the matter was the refusal of the defendant to pay for the cars ".on account of the imperfect brakes and other serious objectionable features." Notice of the determination not to retain the cars or pay for them was not given by the plaintiff to the defendant until the 12th of May, 1888. We dismiss any consideration of the " other serious objectionable features " referred to, because we are not informed by the record that any such existed. On the contrary, the defendant stated that the defects in the cars, independently of the brakes, did not interfere with their operation. The case is then to be disposed of upon the basis that the cars, apart from the brakes, were in every substantial respect what

the contract contemplated, and that the only ground upon which the defendant placed its refusal to pay for them was the insufficiency of the brakes.

We are of opinion that the demand of the defendant that plaintiff make the brakes sufficient, in connection with its expressed willingness prior to its notice of May 12, (no intimation being previously given of any desire or purpose to rescind the contract,) to approve the plaintiff's bill, as soon as the brakes were made sufficient for use on its road, and the expressed willingness of the plaintiff, after notice from the defendant that the brakes were insufficient, to put them in proper condition, (without claiming that it was under no legal obligation to incur expense to that end,) so far changed the relation of the parties to each other that the defendant lost the right, if it had such right, to rescind the contract and return the cars; and the plaintiff must be held to have admitted or recognized its obligation to put the brakes in such condition that they would be adequate for use on the defendant's road.

While it must be taken upon the record before us that the *brakes* in question were entirely useless for the defendant's road, it is not specifically found, nor do the facts found justify the conclusion, that other brakes could not have been supplied for use on the cars constructed by the defendant. If, at trifling expense or without unreasonable exertions, the defendant could have supplied the cars in question with other brakes that were sufficient, the utmost that under all the circumstances it could claim, in reduction of the amount it agreed to pay for the cars, would be the reasonable cost of obtaining new brakes adapted for use on such cars. *Stillwell & Bierce Manfg. Co.* v. *Phelps*, 130 U. S. 520, 527 ; *Miller* v. *Mariners' Church*, 7 Greenlf. 51 ; *Davis* v. *Fish*, 1 Iowa, 407; Sedgwick on Damages, (6th ed.,) 106, 107.

It is found that the defendant operated upon its road combination cars purchased from another company, of a similar character with those constructed by the plaintiff, weighing about six hundred pounds less, and used a brake of a different pattern, costing from seventy-five to one hundred dollars. It

may well be assumed from the findings that the cars in question can be successfully operated with proper brakes costing not more than the last-named sum. If brakes, adequate for use on the cars constructed by the plaintiff, could not be obtained for that amount, that fact is not shown. The ends of justice will be met by a judgment in favor of the plaintiff for the contract price of the cars constructed by it and now in the possession of the defendant, lessened by the sum of $2500, the amount which we must assume, under the findings, it would cost the defendant to replace the brakes furnished by plaintiff with other brakes sufficient for the cars in question.

The plaintiff included in its petition claims for different sums of money aggregating $4219.70, which are claimed to have been expended for the use of the defendant in connection with the contract for building the cars. But the allegations in respect to those claims are traversed by the answer and there is no finding in reference to them. Indeed, no finding in respect to them was asked. The judgment cannot therefore embrace them. We can only direct such judgment as is authorized by the facts specially found by the court below. Rev. Stat. § 701 ; *Fort Scott* v. *Hickman*, 112 U. S. 150, 164, and authorities cited.

*The judgment is reversed with directions to enter judgment in favor of the plaintiff for the sum of $47,500, with interest thereon from the 30th day of March, 1888, at the rate allowed by the laws of Illinois. Reversed.*

Mr. Justice Brewer took no part in the consideration or decision of this case.