SOUTHERN GAS & GASOLINE ENGINE CO. v. ADAMS & PETERS.
(No. 5286.)

(Court of Civil Appeals of Texas. San Antonio. Oct. 7, 1914. On Motion for Rehearing, Oct. 28, 1914.)

1. SALES (§ 121*) — RESCISSION BY BUYER — WAIVER.
The buyer of a traction engine, sold October, 1911, and guaranteed to be of the best workmanship and material and to develop 20 horse power who knew from January, 1912, that the engine was defective in power, and who attempted to repudiate the purchase, but who thereafter repaired it and used it until July in harvesting a crop, and then took it apart to see what the trouble was, thereby waived his right to rescind for breach of the guaranty.
[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 296–301; Dec. Dig. § 121.*]

2. EVIDENCE (§ 457*)—PAROL EVIDENCE—CONTRACT OF SALE—EXPLANATION OF TERMS.
In an action to rescind a contract of sale of a traction engine guaranteed to develop 20 horse power, parol evidence as to whether it was to develop such power at the belt or at the drawbar was admissible, since it is not varying the terms of a written contract to explain what is meant by scientific or trade terms.
[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2104, 2107, 2108; Dec. Dig. § 457.*]

3. SALES (§ 130*)—ACTION TO RESCIND—ISSUES AND EVIDENCE.
In an action to rescind a contract for the sale of a traction engine guaranteed to develop

20 horse power upon a certain test, where the buyer did not plead that the test was ever demanded or made, evidence as to what was meant by 20 horse power as expressed in the contract, whether at the belt or drawbar, was inadmissible.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 322–324; Dec. Dig. § 130.*]

4. TRIAL (§ 350*)—SUBMISSION OF ISSUES—STATUTE.

In an action to rescind a contract for the sale of a traction engine guaranteed to be of the best workmanship and material and to develop 20 horse power, where the question whether the power was to be developed at the belt or at the drawbar was sharply contested, a special issue as to the workmanship, material, and horse power, so framed that the jury could not answer it "Yes" or "No," unless they found the same as to workmanship, material, and horse power, was erroneous, since the statute provision that the court, submitted the case upon special issues, shall submit all the issues made by the pleadings does not permit several questions which might receive different answers to be included as one issue and submitted so as to admit of but one answer to all of them.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 828–833; Dec. Dig. § 350.*]

5. TRIAL (§ 350*) — SUBMISSION OF ISSUES — CONVERSE OF PROOF.

In such action, where there was a question whether the guaranteed horse power was to be developed at the belt or at the drawbar, the submission of the issue whether it had been established that it was to be tested at the drawbar was sufficient, since, if the drawbar was meant, it would necessarily follow that the belt was not meant, and it would be unnecessary to submit the converse of that which has already been affirmatively given.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 828–833; Dec. Dig. § 350.*]

6. TRIAL (§ 350*)—INSTRUCTIONS—ISSUES.

In an action to rescind the sale of a traction engine for breach of the guaranty that it was of the best workmanship and material and to develop 20 horse power, where the issue as to power was submitted, the seller was entitled to an answer whether the workmanship and material were as guaranteed, and whether it had refused to furnish new parts.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 828–833; Dec. Dig. § 350.*]

7. SALES (§ 179*)—ACCEPTANCE OF DEFECTIVE ARTICLE—LIABILITY FOR PRICE.

Where a buyer of machinery accepts it in defective condition and undertakes to place it in good condition at the cost of the seller, he becomes liable for the price, less his necessary expenditure.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 456–468; Dec. Dig. § 179.*]

8. EVIDENCE (§ 413*) — PAROL EVIDENCE — FORM OF CONTRACT.

In an action to rescind a contract for the sale of a traction engine, where no fraud, accident, or mistake in the execution of the contract was pleaded, evidence that the form of the contract between the parties was a form used for stationary engines and not for traction engines was inadmissible, since the contract could not be varied or set aside by oral testimony.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1855–1857, 1859, 1860; Dec. Dig. § 413.*]

9. EVIDENCE (§ 131*)—RELEVANCY—SIMILAR FACTS.

In an action to rescind a contract for the sale of a traction engine guaranteed to develop 20 horse power, evidence that another traction engine, operating in a field two miles distant from the engine in question, would pull 12 disc plows, while the one in controversy was pulling 6, was inadmissible, where the other engine was of a different horse power and make, had a different driver, whose comparative skill was not shown, and where it was not shown that the two engines were operating under the same conditions as to soil, etc.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 399–402; Dec. Dig. § 131.*]

10. SALES (§ 442*)—BREACH OF GUARANTY—DAMAGES.

In an action to rescind the sale of a traction engine for breach of guaranty to develop 20 horse power, where the seller was told that the buyer wanted it for use in raising and harvesting potatoes, the difference between their market price at the time they should have been gathered and the price at the time they were harvested on account of defects in the engine, taking into account their loss by rot and the fluctuations of the market, were proper for consideration on the question of damages.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1284–1301; Dec. Dig. § 442.*]

11. SALES (§ 130*)—BREACH OF GUARANTY—QUESTION FOR JURY.

In such action, held, on the evidence, that the question whether the buyer used due diligence to protect himself against loss after his discovery of the defects was for the jury.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 322–324; Dec. Dig. § 130.*]

12. SALES (§ 442*) — ACTION TO RESCIND — DAMAGES.

In an action to rescind the sale of a traction engine guaranteed to be of the best workmanship and material and to develop a certain horse power, the measure of damages as to the engine itself was the difference between the contract price and what it was worth when received.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1284–1301; Dec. Dig. § 442.*]

13. SALES (§ 130*) — ACTION TO RESCIND — EVIDENCE.

In an action to rescind a contract for the sale of a traction engine for breach of guaranty as to materials, horse power, etc., where defendant had testified that the seller's agent had refused to deliver a magneto, unless defendant would sign purchase-money notes, testimony of the seller's witnesses that they had not given such agent such instructions when they sent the magneto to the buyer by him was relevant.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 322–324; Dec. Dig. § 130.*]

## On Motion for Rehearing.

14. APPEAL AND ERROR (§ 644*) — BILLS OF EXCEPTION—WAIVER.

Under rules 40 and 41 of Courts of Civil Appeals (142 S. W. xiv), authorizing the court to rely upon briefs for a proper presentation of the case on appeal without an examination of the record, and providing that whatever of appellant's statements in his brief is not contested will be considered as acquiesced in, a party who in his brief does not object that there are no bills of exception in the record to the action of the court complained of in the assignments, or until his motion for a rehearing, thereby waives such objection, and the court may consider the assignments.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 2795–2798; Dec. Dig. § 644.*]

Appeal from District Court, Harris County; Wm. Masterson, Judge.

Action by the Southern Gas & Gasoline En-

gine Company against Adams & Peters, with cross-action by defendant. Judgment for defendant, and plaintiff appeals. Reversed and remanded.

Bryan & Bryan, of Houston, for appellant. Fisher, Campbell & Amerman, of Houston, for appellee.

CARL, J. The appellant, Southern Gas & Gasoline Engine Company, sued Adams & Peters, appellees, to recover a balance due on the purchase price of one 20 horse power Flour City traction engine sold by appellant to appellees in October, 1911. Appellees answered and filed a cross-action, alleging that the engine had failed to develop 20 horse power traction pull and was defective in material and workmanship.

It was alleged that appellant contracted to sell them "a 20 horse power traction engine," by which was meant (as commonly known and understood, especially among machinery men) to mean one which would develop a traction force or power when in operation of "20 horse power"; and further that said engine was warranted to be of the very best workmanship and material, and that the same, when properly handled, would develop the specified power.

It is further pleaded that appellees had notified appellant before, and at the time of purchasing said engine, that they desired the same to use upon their potato farm, for the purpose of drawing plows, potato diggers, etc., in planting, cultivating, and harvesting Irish potatoes for the market; that said engine did not work properly from the start, of which they advised appellant; and that appellant, on various occasions, sent its agents and representatives to work on said engine, and adjust the same, and, after each attempt to repair the same, appellant, its agents and representatives, assured appellees that same would then fulfill the requirements in the contract and do the work expected. And further that appellees relied upon the warranties and representations of appellant and repeated assurances, and did not know, prior to the time the potato crop was ready to be harvested, that they would not be able to harvest the crop by the use of the engine, and depended upon it for that purpose; that the engine would not develop 20 horse power and was not of the best material and workmanship; that when they began harvesting their crop, about June 1, 1912, they were unable to do so, because of defective workmanship and material in said engine and on account of the fact that it did not develop 20 horse power; and that on that account it took the appellees about six weeks or more to harvest their crop, which might have been harvested in two weeks had the engine been as represented, they having no other means of harvesting the crop of potatoes; that the engine was of no value at the time of its delivery. They asked for re-

scission of the contract; for recovery of the part of the purchase money paid; for amount of freight paid by them on the engine from the factory to Duke's Station, and an additional sum of $24 freight and demurrage on said engine from Duke's Station to Sheppard's Switch, because appellant failed to ship the engine to the latter place as provided in the contract; for amount of repairing done on the engine in an effort to make it work; for the amount of damages sustained by them to their potato crop by failure to get same harvested before the market declined.

The purchase price of the engine was $1,750, one-third in cash upon arrival of engine, one-third in 8 months, and one-third due in 12 months.

The contract of sale states that appellant proposes to furnish and deliver f. o. b. cars at factory "one 20 H. P. Flour City gasoline traction engine," and the guaranty clause reads:

"Guarantee.—The material in the machinery and workmanship shall be of the very best class, and if any part of said machinery shows defective material or workmanship within one year from date of shipment, we agree to furnish a new part free of charge f. o. b. factory, to replace such defective part. The engine, when in proper condition and correctly installed, adjusted and handled, is guaranteed to develop the power as rated, when using satisfactory fuel as herein specified. (Upon written demand, within 60 days from date of invoice, we will make a regular Proney brake test after the plant is properly installed, the purchaser to furnish all facilities, material and assistance, and if the engine develops the power as above mentioned, under the conditions herein specified, he is to pay the entire expense thereof.)"

On answers to special issues submitted to the jury, judgment was rendered that appellant take nothing as against appellees, and that the contract of sale be rescinded and canceled, and in favor of appellees against appellant for $583.33 paid as part of the purchase price, together with interest, $24 freight and demurrage from Duke's Station to Sheppard's Switch, $156 freight paid from the factory to Duke's Station, $165.80 for repairs on the engine, $2,159.01 damages sustained by defendant to their potato crop, or an aggregate sum of $3,088.14.

The engine was delivered about November 20, 1911, and unloaded by appellees a few days later. Mr. Adams, one of the appellees, is a practical machinery man, and upon his testimony in the main they rely. He says they began trying to use the engine about the 25th of November, 1911.

"We used it the last week in November, or tried to use it until the 10th or 12th of December; that is, for nearly three weeks, or two weeks anyhow. We tried it in January; I think we did."

He says he did not at that time know it would not produce 20 horse power, because he had no catalogue nor specifications, and that he relied on the representations made that it would do so.

"I don't know that I can now fix the time as to when I first discovered that that engine

was not a 20 horse power at the drawbar. I don't know whether it was as early as the 1st of February or not. I came up here to tell them it wasn't doing 20 horse power work, and I believed it when I so told them, which was probably the first week in February. I know during the first week in February that the engine was not developing 20 horse power, and I told them it wasn't doing the work a 20 horse power engine should do, and at that time they told me to sit still, that they would have a man down here that could make it do anything. Either Mr. Leavens or Mr. Marlin said that Mr. Adcock (the man who first came) wasn't a traction man. He said he was a stationary engine man, and this man from the factory knew what he was doing, and I told them all right, we would wait and see what he was. I don't know when I at last came to the conclusion we didn't have a 20 horse power engine at the drawbar, but when we failed to make it work the first time I had some doubts about it. Mr. Fahling didn't make it work the first time when he was there in January. When Mr. Fahling was down there, it was raining both times, and he didn't get to show the engine out under favorable conditions. He said if it was dry he could make it pull the plows, and a whole lot of things, and I had to accept his statement because I couldn't say it wouldn't. * * * Adcock was sent down there the 24th or 25th of November, 1911, and was there up to about the 29th when he returned to Houston. He did not succeed in fixing it. Couldn't get the hitch arranged, and, when they got that fixed, it wouldn't pull the plow. It then began raining, and nothing was done with the engine until in January, and I came up and told these people here it was not giving satisfaction."

He says he was told to wait till Fahling came. He did come, and the engine failed to do any better.

"Then, about that time, why the bolts that hold the connecting rod broke—snapped off—and we were a month getting that fixed; then Mr. Fahling came back a second time and tried to make it work, and the magneto played out along about that time." "When I say 'about that time' I am talking about early spring of that year, probably April; it might have been the last of March. . It was in February when we finished plowing our land for the potato crop. We finished with the mules."

The last time Fahling was there, Adams says, he brought a new Remy magneto to put on, but refused to put same on the engine until the notes were signed for deferred payments, which Adams declined to do, stating that the engine was defective otherwise. Fahling then took the magneto away and returned no more. The engine was used some time after that before the harvesting of the crop began. About the 1st of June, appellees put a new magneto on and used the engine in harvesting the crop up till in July, although the evidence shows that it did not work well, and that it took about six weeks to do the work it should have done in two weeks, if working well.

On May 8, 1912, appellees wrote appellant that the engine was not working well, was not according to contract, and would be held subject to its order, upon repayment of the cash payment made. It was about the last of May or first of June that appellees put the new magneto on the engine. Adams says:

"I know that when we got through digging the potatoes (which was in July) we tore the engine down, and saw what the trouble was."

The evidence shows that the items of expense in repairs on the engine were paid out by appellees; and it may be said that, if admissible, the testimony also shows that the value of the potato crop and damage thereto were as found by the jury.

It will be noted, from an inspection of the pleading, that no fraud, accident, or mistake is alleged in the action for rescission; but it is claimed that certain warranties as to the power of the engine and of the material and workmanship were made. These warranties are pleaded, and recovery based thereon is sought. Appellees discovered in January, 1912, that the engine would not develop 20 horse power and were dissatisfied with it. On May the 8th they wrote a letter repudiating the purchase and telling appellant the engine was held subject to its order, and giving the reasons why this action was taken. After that they continued to use it until about the first week in July.

[1] No fraud is charged in this case, but even if it had been, this being strictly an action for rescission and damages, appellees had no right to continue to use the engine until the crop was harvested and then to offer it back after it had been torn down. Mr. Justice Fly has well said in Hallwood Cash Register Co. v. Berry, 35 Tex. Civ. App. 554, 80 S. W. 857:

"The rule is that a defrauded party must disaffirm the contract at the earliest practical time after the fraud is discovered, and that he must return or offer to return whatever he has received from the other party; and if he retains the article purchased, and continues to use it after discovery of the fraud that induced the purchase, he will be held to have waived the right to rescind the contract and to have acquiesced in it."

Again, Chief Justice James, in Geiser Mfg. Co. v. Lunsford, 139 S. W. 64, said:

"The testimony shows clearly that they kept and used the machine, after they knew that defendant would not perform the promises; and after they knew that defendant denied and repudiated the making of the promises they continued to use the machine under such circumstances until they abandoned it to its fate somewhere out in the country in Hale county. Admitting that such failure and refusal would give plaintiffs the right to rescind, it was nevertheless essential to such relief that upon discovery of the fact that the promises would not be performed to not only tender or offer to return the machine, but to hold to such position consistently, instead of, as they did in this case, proceeding with the use of the machine, recognizing the contract. Kempner v. Advance Thresher Co., and cases there cited, 118 S. W. 717; Grabenheimer v. Blum, 63 Tex. 369."

Appellees had known from January, 1912, until July of that same year that the engine was defective in power and in workmanship and material, if we take the testimony of Mr. Adams, who was a practical machinist and had charge of the engine. In May they attempted to repudiate the purchase. Following all this they continued to

use the machine until July. We are therefore led to the conclusion that, notwithstanding appellees' letter of May 8th, they did not repudiate the sale, but dealt with the property as their own long after they had discovered all of the alleged breaches of warranty. In addition to the authorities following, Justice Moursund has treated this subject extensively in Luckenbach v. Thomas, 166 S. W. 99. The first and second assignments of error are sustained. Hallwood Cash Reg. Co. v. Berry, 35 Tex. Civ. App. 554, 80 S. W. 857; Geiser Mfg. Co. v. Lunsford, 139 S. W. 64; Houston Motor Car Co. v. Brashear, 158 S. W. 233; Scalf v. Tompkins, 61 Tex. 476; Pullman Co. v. Street Car Co., 157 U. S. 94, 15 Sup. Ct. 503, 39 L. Ed. 362; Foster v. Rowley, 110 Mich. 63, 67 N. W. 1077; Palmer v. Banfield, 86 Wis. 441, 56 N. W. 1090; Bassett v. Brown, 105 Mass. 551.

The third and fourth assignments of error deal with exceptions to the admissibility of certain testimony as to what is meant by 20 horse power, as expressed in the contract, whether at the belt or drawbar, (1) because such testimony would vary the terms of a written contract, (2) because the contract provided that the engine would develop 20 horse power when subjected to the Proney brake test, and (3) it was not alleged that such test had been made; and the fifth assignment complains of the refusal of the court to submit a special instruction that the evidence failed to show that there was any general or universal custom among machinery men, whereby it was understood that, when a gasoline engine was sold at a certain rated horse power, it was generally and commonly understood that such rated horse power was at the drawbar and not at the belt, and as the contract provided for the Proney brake test, and that the undisputed evidence showed that the engine was to develop 20 horse power at the belt and not at the drawbar.

[2] The contract states that it is to be "one 20 H. P. Flour City gasoline traction engine." It is not varying the terms of a written instrument to explain what is meant by a term used therein, especially a scientific or trade term which is not generally understood. Here we have the written instrument merely stating that the engine is to develop 20 horse power. It is nowhere stated that it is to develop that power at the belt or drawbar, and the only way a layman could understand the term would be by proof as to what is meant by such a term. If it had stated that the power should be tested at the drawbar or belt, there could be no question that parol evidence could not be introduced which would tend to vary the writing. But parol evidence is admissible to aid in the interpretation of a contract in accordance with the recognized meaning of any word or term therein, as used in any art,

science, or the trade or particular business out of which it arises. To the average juror, scientific or trade terms, such as this, would be meaningless unless so explained, and such explanation is not a variation of the contract in any sense of the word.

[3] We are of the opinion that the third assignment should be sustained, because it was not pleaded that the Proney brake test was ever demanded and made as provided in the contract; but the fourth assignment, raising specifically the question of the admissibility of testimony to explain what is meant by 20 horse power, whether at the belt or drawbar, is overruled, and a like disposition is made of the fifth assignment, complaining of the refusal of the requested charge therein set forth.

[4] By the sixth assignment complaint is made of the action of the court in refusing to submit the charge requested as to whether the engine failed to develop 20 horse power at the belt; by the seventh assignment that the court erred in refusing to submit the question as to the horse power separate from the question of the quality of the material and workmanship; and by the eighth assignment that the court erred in submitting special issue No. 1 as to the horse power, quality of material and workmanship, all in one question. As to the first two, special issues were requested on these points and were refused. The question as to where the horse power was to be tested was a sharply contested point; appellees contending that it should be at the drawbar and appellant that it should be at the belt. Special issue No. 1 was so framed that the jury could not answer it "Yes" or "No," unless they found all three one way. Suppose the engine were defective in material, but was not in workmanship, and at the same time developed 20 horse power, we will say at the drawbar, as contended by appellees. The jury could not make reply as required by the court. Appellant made timely request for the submission of these issues and filed objection to that complained of in the eighth assignment. A party is entitled, upon timely request, to have each material issue submitted to the jury in such a way as to make a clear-cut issue; and the court should not group contested issues so as to require the jury to give an affirmative or negative answer to the whole group. A party is entitled to an answer on each material issue, and when the statute says "it shall be the duty of the court, when it submits a case to the jury upon special issues, to submit all the issues made by the pleading," it does not mean that several questions, which might receive different answers, may be embraced as one issue and submitted in a way to admit of but one answer to the whole group. The sixth, seventh, and eighth assignments are sustained.

[5] Upon the question of custom among

machinery men as to what is meant by horse power, the court submitted to the jury to determine whether it had been established that the rated horse power was to be tested at the drawbar, as contended by appellees, and we think this was sufficient. According to the testimony, there were only two places where it was claimed the power should be tested, and they were at the drawbar and belt. So, if it be shown, by custom, that it was meant at the drawbar, it would necessarily follow that it would not be at the belt. It is not at all necessary to submit the converse of that which has already been affirmatively given. The ninth assignment is overruled.

[6] The court submitted special issue No. 1 as follows:

"Do you or not find from the evidence that the engine in controversy was of the power represented in said contract, and that the material and workmanship used in construction of said engine was of the very best class? In answering this question you will say, 'First, we find that it (was) or (was not),' as you may find from the evidence. In this connection you are charged that, in order for the parties to be bound by custom, it is necessary that the defendants shall establish, by the preponderance of the evidence, that it was commonly understood among the dealers in machinery and gasoline traction engines in selling a traction engine at a rated horse power that, in the absence of any agreement, it was understood that the horse power mentioned was rated at the drawbar, and such custom must not be temporary but must be general as to the particular trade and so well established that every one dealing in that trade, namely, in this instance, in the gasoline traction engine trade, is presumed to know such custom and make contracts with reference thereto."

Appellant requested the following special issues which were refused:

"Fourth. Did any part of said engine show defective material or workmanship?

"Fifth. If, in answer to the foregoing question, you say that any part of said engine showed defective material or workmanship, then was the plaintiff, Southern Gas & Gasoline Engine Company, ready, able, and willing to furnish new parts free of charge f. o. b. factory when called upon by the defendants, Adams & Peters?"

If the engine developed the power at which it was rated, but the material and workmanship were not as provided in the contract, it seems to us that appellant was entitled to know those facts from the jury. And it was entitled to have it determined whether it had failed and refused to furnish new parts. This may become material in view of another trial.

[7] But this is an action to rescind the contract, and not to offset the purchase price to the extent of necessary repairs.

"Where a buyer of machinery accepts same in defective condition, and undertakes to place it in good condition at the cost of the seller, he becomes liable for the price, less the amount necessarily used to place it in good condition." Saunders' Ex'rs v. Weekes et al., 55 S. W. 34; Masterson v. Heitman, 38 Tex. Civ. App. 476, 87 S. W. 227.

The tenth assignment is sustained, and a like disposition is made of assignments 11, 12, 13, and 13½.

[8] The fourteenth assignment complains of the action of the court in permitting witnesses to testify "to the effect that the written contract between the parties was a form of contract used among machinery men for stationary engines, and not for the sale of traction engines, because the contract was the best evidence of its own contents and its terms and conditions, and could not be varied or set aside by the oral testimony of witnesses as to their understanding, opinions, and conclusions, and the evidence is irrelevant and immaterial." There is no fraud, accident, or mistake pleaded as to the execution of the contract, and it would certainly not be subject to attack in this manner. The assignment is sustained. Railway Co. v. Hannig, 91 Tex. 347, 43 S. W. 508; Metropolitan Company v. Wagner, 50 Tex. Civ. App. 233, 109 S. W. 1120, 1121.

[9] The contract permitted witnesses to testify, over objection, that another traction engine of 22½ drawbar pull, or 45 horse power belt pull, operated in a field about two miles distant from the engine in question would pull 12 disc plows, while this engine was pulling 6 plows, and this evidence was objected to because it was not shown that the two engines were operating under the same conditions, being of different make, different horse power, and not being operated by the same man, and further that it was not shown that the soil was the same, nor that the same physical conditions existed. For instance, it is in evidence that a great deal depends upon the engineer in charge and the lay of the land, and whether hard or soft soil, or whether it is wet or dry. The other engine (the Hart-Parr) was of a different horse power and made by another factory. A negro driver was operating the engine in controversy, and it was shown that he had wrecked the engine and had broken disc plows by running onto stumps, and he had never operated a traction engine before that one. It is not shown what kind of man was operating the Hart-Parr engine, to which this one was sought to be compared. Chief Justice James has well said that:

"Testimony of this character ought not to be admitted if the difference in conditions is probably such as would have a tendency to confuse or mislead the jury in considering the matter at issue." Olivaras v. Railway, 77 S. W. 981, 982.

Unless the conditions and surroundings are the same or similar, testimony of this character ought not to be admitted, for, if not so limited, the jury will be led off into a maze of comparisons; confusion and unsatisfactory results being the natural consequence. It may be said that the driver is of no material consequence, for instance, and yet one man may be able to get the greatest possible efficiency out of the engine, while another would not even approach it; one aeronaut may be able to describe all manner of figures in the air, while another would only pilot a wreck in the attempt, as this negro driver did.

Chief Justice Fisher held that similar testimony should have been rejected, the conditions not having been shown to be similar. The fifteenth assignment is sustained.

[10] Assignments 16, 17, 17½, 18, and 19 raise, in different forms, objections to the measure of damages as submitted by the court and are treated together. It is contended that the fall in the price of potatoes and others rotting in the ground was not the natural and proximate result of the engine not being as provided in the contract, and could not reasonably be foreseen at the time the contract was made. Further that appellant was not responsible for fluctuations in the potato market. But it is shown that at the time the engine was purchased, and many times thereafter, appellant was apprised of the purposes for which it was bought. In fact, Mr. Marlin, president of appellant, testified:

"I knew they wanted the engine, which they were thinking of purchasing, for the purpose of use on the potato farm."

It is argued that it would be speculative to a high degree to hold appellant for loss of potatoes by rotting and for a fluctuation in the market eight or nine months after the contract was made. It was well known, however, at the time the engine was sold, that it was to be used in raising and harvesting a crop of potatoes, and it must have been in contemplation of the parties that the crop would mature at about the time it was gathered. And it must likewise have been in the minds of all the parties that the market was subject to fluctuations. The only way that damages could be proven, then, would be to prove the market price at the time the potatoes should have been gathered, and what it was at the time they were able to harvest them on account of any defects in the engine. We do not think the court erred in this respect, except that, of course, appellants would be entitled to full protection and credit for what the crop brought on the market. These assignments are overruled.

[11] As to whether appellees used due diligence to protect themselves against loss after the discovery of the defects, if any, in the engine was a question for the jury, and the twentieth assignment is overruled.

[12] In regard to the engine itself, the measure of damages would be the difference between what it was worth at the time received and the contract price, and not what it was worth in June of the following year. This being an action for rescission, the evidence of value in June was doubtless permitted to support the allegation that it was of no value, and thereby avoid an actual tender. Assignment 22 is therefore sustained. Aultman v. Hefner, 67 Tex. 59, 2 S. W. 861; Heisig Rice Co. v. Fairbanks, Morse Co., 45 Tex. Civ. App. 383, 100 S. W. 959; Aultman Co. v. Cappleman, 36 Tex. Civ. App. 523, 81 S. W. 1244; Southern Gas & Gasoline Engine Co. v. Peveto, 150 S. W. 279; Mechem on Sales, §§ 817–1830.

[13] Appellee Adams having testified that Fahling had refused to deliver the magneto unless Adams & Peters would sign the notes, it was not irrelevant to permit appellant's witnesses C. A. Leavens and C. W. Marlin to testify that they had not given Fahling such instructions when they sent the magneto by him to appellees; but this was not such error as would cause us to reverse the case, if that were the only trouble.

What we have already said makes it unnecessary to say more than that all other assignments are overruled.

The judgment is reversed, and the cause remanded.

### On Motion for Rehearing.

[14] Appellees urge, in their motion for a rehearing, that this court erred in sustaining appellant's assignments of error numbered 6, 7, 8, 10, and 11 for the reason that said assignments complained of the errors of the trial court in either giving charges or refusing charges to the jury, and that there are no bills of exception in the record to the action of the court complained of in the assignments, and therefore this court had no power to consider and determine such assignments.

Both parties to this appeal filed lengthy and able briefs, but appellees nowhere in their brief made any objection to the consideration of these assignments. Nor was our attention ever called to the fact that no bills of exception were reserved to the action of the court in such matter until the motion for a rehearing was filed. Under rule 40 this court is authorized to rely upon the briefs for a proper presentation of the case on appeal, without an examination of the record; and to assume that if there were any objections to the assignments or to the matters upon which the same were predicated, the other party would call our attention to it. Rule 41 (142 S. W. xiv), expressly provides that:

"Whatever of the statements of appellant or plaintiff in error in his brief is not contested will be considered as acquiesced in."

We did not go into the lengthy transcript to see if there were preserved bills of exception, but assumed that, if counsel for appellees had any objection to the consideration of said assignments, the same would have been made known to us. Appellant insists that objections or exceptions were preserved and are shown in the record; but that is aside from the question. To tolerate a practice of this kind would virtually require a resubmission of the case. Certainly another consideration along a line not heretofore presented to us. It would be equivalent to giving a party two opportunities to brief the case. No matter what disposition this court would have made of these assignments, had timely objection been made, when able coun-

sel present to us a brief upon all of them, in which they are presumed to urge every point favorable to them and do not raise the question, now for the first time urged, until a motion for rehearing, this court will consider that any other objection not contained in the brief was waived, unless it be some matter of fundamental law. And this is not a question of fundamental law, being purely one of procedure.

Other matters require a reversal anyway, and the motion for rehearing by appellee is overruled; and a like disposition is made of appellant's motion for rehearing.