## Ludwig S. Filbert, Charles A. Porter, Kennedy Crossan and John Keller, trading as Filbert, Porter & Co., *v*. The City of Philadelphia, Appellant.

*Contracts—Municipal contract—Reservoir.*

A municipal contract for the building of a reservoir provided that the material should be furnished and the work performed " in strict and exact accordance with the plan on file in the department of public works and the specifications hereto attached." It also provided that " the contractor is bound to adopt any change of plan that may be deemed advisable, and an allowance will be made for or against him, as the case may be, the amount of such allowance to be determined by the chief of the bureau of water, and approved by the director of the department of public works, and stated in writing previous to the work being done. Such alterations will not annul the contract, except as to such altered parts." The contractors were to do certain enumerated things " and all work necessary to make a complete and perfect reservoir ready for use, and leave the grounds in a suitable condition." The reservoir was built in exact accordance with the plans and specifications. It, however, leaked, and this defect was solely due to the micaceous rock upon which it was built. During the progress of the work changes were made by the city officials, and it was conceded that these were honestly made for the benefit of the city. *Held*, (1) that the contractors were bound to build as directed, and

having done so, they were not liable for defects in the reservoir; (2) that it was within the power of the city to provide in the contract for changes, and to authorize the director to make them; (3) that a verdict and judgment in favor of the contractors for the balance due upon the contract should be sustained.

Where there is a recovery for substantial performance of a building contract, there must be proof of defects as a foundation for the claim for an allowance, before a deduction can be made as a compensation to the owner, for the defects.

Argued April 2, 1897.  Appeal, No. 72. Jan. T.. 1897, by defendant, from judgment of C. P. No. 3, Phila. Co., June T., 1895, No. 682, on verdict for plaintiffs.  Before STERRETT, C. J., GREEN, McCOLLUM, MITCHELL and FELL, JJ.  Affirmed.

Assumpsit to recover balance due on a municipal contract for building a reservoir.  Before McMICHAEL, J.

The facts appear by the opinion of the Supreme Court, and by the charge of the court below which was as follows :

The plaintiffs, Ludwig S. Filbert, Charles A. Porter, Kennedy Crossan and John Keller, trading as Filbert, Porter & Company, claim of the defendant, the city of Philadelphia, the sum of $122,731.77, with legal interest thereon from January 1, 1895, which they say is justly due and payable to them by the defendant because the director of the department of public works of the city of Philadelphia, by authority vested in him, did, according to law, award a contract for the erection and construction of a reservoir for the supply of water to the city of Philadelphia, on grounds situate in the twenty-eighth ward, to the plaintiffs, said contract being executed in writing on November 2, 1892, by the authorized officers of the defendant, together with a supplemental contract made and executed July 13, 1893.  And they further say that the reservoir was duly erected and constructed in proper time, and in accordance with the covenants and conditions of said contract and specifications, as lawfully made by James H. Windrim, Esq., director of the department of public works, and in accordance with a letter of the said James H. Windrim, dated March 31, 1894.  They further say that all of the said work was inspected and approved by the defendant by and through its authorized agent, and that there became and was justly due to the plaintiffs the sum I have mentioned, said

sum being a balance due for said work in accordance with the terms of said contract. The city of Philadelphia filed pleas to this statement and the cause has come before you for your determination.

The contracts under which the plaintiffs claim are two in number. The first is dated November 2, 1892, and was between the city of Philadelphia and L. S. Filbert, Charles A. Porter, John Keller and Kennedy Crossan, trading as Filbert, Porter & Company; and by that contract, in consideration of the payments thereinafter specified and agreed to be made, the contractors contracted and agreed to furnish all the material and perform all the preparatory work necessary in the construction of a reservoir on a plot of ground bounded by Queen street, Thirty-third street, Abbottsford avenue and Thirty-first street, in the twenty-eighth ward of the city of Philadelphia, in strict and exact accordance with the plan on file in the department of public works, and the specifications thereto attached, which said plan and specifications were made a part of the contract. This work was to include the removal of the buildings and refuse material, excavation of the earth, soft and hard rock, building of embankments, lining with clay, sodding and seeding. The contractors further contracted and agreed that all of the materials used in the said work were to be of the best of their several kinds and qualities, and that all of said materials and work and labor were to be subject to the inspection and approval of the director of the department of public works of the city of Philadelphia, and in case any of said materials or work should be rejected by said director as defective or unsuitable, then the said materials were to be removed and replaced with other materials ; and the said work was to be taken and done anew, and to the satisfaction and approval of said director, at the cost and expense of the said parties of the second part. And it was further agreed that if in the opinion of the said director the contractors were prosecuting the work with an insufficient force of workmen or with an insufficient stock of material for the prompt completion of the work, or were to discontinue the performance of the work before completion, or were to neglect or to refuse to remove such materials, or to take down and rebuild such work as was rejected by the said director as defective or unsuitable, or were in any other manner in the opinion of the said director to make

default in the performance of the contract, then, and in any such case, it was to be lawful for the director, and he was authorized and empowered, to purchase materials and employ contractors or workmen to properly complete the work at the cost and expense of the original contractors. And it was further agreed that should the contractors fail, after twenty-four hours' notice from the director, to do any of the work which comes within the limits of this contract, then the director may annul the contract and proceed to do the work, either by contract or otherwise, and charge the cost against the contractors. The contractors agreed to place signal lights and protect the work as it went along, and it was agreed that the contract was entered into under and subject to the provisions of the act of June 1, 1885, sometimes called the Bullitt Bill.

The contractors were to be paid in monthly payments by warrants drawn on the city treasurer by the chief of the bureau of water, and approved by the director of the department of public works, upon estimates made of the amount of excavations that had been made during the preceding month, at the rate of one dollar and a half a cent per cubic yard, reserving therefrom ten per cent of the said monthly estimates until the final payments. The amount to be expended for the preparatory work under the contract was not to exceed the sum of $795,613.84. The contractors further agreed that they would, when requested, enter into a contract with the city to complete the entire work of the construction of the reservoir in accordance with the plans and specifications on or before January 1, 1895, subject to further appropriations by councils to pay for the work. In case the parties of the second part should fail to enter into the contract and fully complete the entire work within the time specified, in strict conformity with the plans and specifications, the parties of the second part were to pay to the party of the first part the sum of $100,000. A supplemental agreement was made July 13, 1893, between the same parties, and by it the contractors agreed, in addition to the work provided to be done under the agreement of November 2, 1892, to furnish all the materials and perform all the work necessary to fully complete the construction of the reservoir, and it was agreed that the additional work was to be done in strict and exact accordance with the plans on file in the

office of the director of the department of public works, and the specifications.   And there was a stipulation that the contractors were to pay $100,000 to the city if they failed to fully complete their entire work by January 1, 1895.   This was repeated, and the city, on its part, agreed to pay the contractors the sum of $363,977.16.   These contracts were in writing and were signed and sealed by the mayor of the city, on behalf of the city of Philadelphia, and by each of the contractors.   These contracts were made under and by virtue of ordinances of the select and common councils of the city of Philadelphia, one of which was approved October 1, 1892, and is as follows: "The select and common councils of the city of Philadelphia do ordain that the director of the department of public works be hereby authorized and directed to prepare plans and specifications, and award a contract or contracts for the construction of a reservoir in connection with the supply of water to the city, in the ground in the twenty-eighth ward, appropriated by virtue of the ordinance of councils approved March 21, 1892.   That the sum of $1,000,000 be, and the same is hereby, appropriated in new item eleven of the annual appropriation of the department of public works, bureau of water, for the purpose as aforesaid out of the loan authorized by ordinance approved September 16, 1892," and the contract and the surety of Filbert, Porter & Company for the preparatory work necessary in the construction of the reservoir on the plot of ground bounded by Queen street, Thirty-third street, Abbottsford avenue, and Thirty-first street, in the twenty-eighth ward of the city of Philadelphia, was approved October 31, 1892; and the supplemental contract was authorized by ordinance to make additional appropriation to item nine and a half in the annual appropriation of the department of public works, bureau of water, for the year 1893, for the construction of the Queen Lane reservoir, and was approved May 15, 1893, and the surety and supplemental contract were duly approved by ordinance, so that there was a preceding appropriation before the contract was made, which is required by law.

It also appeared by the testimony that in pursuance of the authority vested in him, the director of the department of public works had advertised for bids, and had awarded the contract for building the Queen Lane reservoir to the plaintiffs, as the lowest responsible bidders.   The contract, therefore, was in

accordance with law, the necessary prerequisites of appropria,
tion and advertisement having been complied with, and they
were in writing. The specifications which are made part of the
contract are quite elaborate and set forth somewhat in detail,
first the general plan on which the reservoir is to be built ; the
approximate quantities of work and materials required, and the
manner in which the work is to be done; and the chief of the
bureau of water, subject to the approval of the director of the de-
partment of public works, by several clauses of the specifications,
(such, for instance, as the provision in section four, which re-
quired that all such trees, vines and shrubs as might be required
by the bureau of water, be reserved ; and in section seven, that
all other materials not reserved or not required by the construc-
tion of the work must be removed from the ground as and when
directed by the chief of the bureau or his authorized assistants ;
and in section nine, in reference to the excavations, that the
excavations shall be made to the lines and grades given by the
chief of the bureau during the progress of the work, at such
places and such times as he might direct; and as in section ten
of the specifications, in regard to embankments, where it was
provided that whenever rock is encountered on the face of any
embankment it shall be removed to such a depth below sub-
grade as shall be directed by the chief of the bureau, and re-
placed with puddle clay, and that, when required, all seams in
the rock on the slopes or bottom shall be cleaned and grouted,
and, if deemed necessary by the chief of the bureau of water,
an extra fill of clay must be placed on any part of the bottom
or slopes ; and as in section thirteen, where the stone used is
to be approved by the director of the department of public
works ; and as in section seventeen, where the clay lining is to
be tied into the embankment by cutting steps and working the
back clay and back material together as often as is directed by
the chief engineer ; and as in section twenty-eight, where it was
provided that there will be no crowning to the pavement except
where the surface drainage demands as may be directed by the
chief of the water bureau). By the provisions which I have
stated as illustrations, the chief of the bureau, subject to the
approval of the director of the department of public works, was
to have general superintendence and control of the work, and
to be the judge of the quality of the materials used. But prob-

ably the most important reservation of power over the contractor by the chief of the bureau and director of department of public works is to be found in the twenty-ninth section of the specifications under the head of " General Items." In that section it is provided by the seventh clause as follows : " The contractor is bound to adopt any change of plans that may be deemed advisable, and an allowance shall be made for or against him, as the case may be. The amount of such allowance to be determined by the chief of the bureau of water, and approved by the director of the department of public works, and stated in writing previous to the work being executed. Such alterations will not annul the contract except as to such altered parts."

Early in the case it became my duty to.construe and give the meaning of this clause when the question arose upon admission of testimony to show that the director of the department of public works had made changes in the contract. I thought then, and I think now, that the contract gave the director that right. It was argued that, notwithstanding this reserved power in the contract itself, the director of the department of public works 'had no power to alter, even greatly to the advantage of the city of Philadelphia, the provisions of the contract during the construction of the work. Such an interpretation of the contract would, in my judgment, be opposed to common sense, and it is not in accordance with the law of Pennsylvania. In all great engineering work, however careful may be the specifications and plans, modifications and changes may become necessary, and if the city of Philadelphia were forbidden by law to reserve to itself the power to make changes, it would be helpless, and quite unable to make any progress. Nor do I think that any such doctrine has been announced by our highest tribunal. It has said that the law of Pennsylvania is that the contracts of and with the city of Philadelphia must be in writing, but it has not said that it is impossible for the contract to be made by the city of Philadelphia, or for the city of Philadelphia, which may contain within its terms a provision for the alteration of the general plan of the detailed work for the contemplated structure.

The general control and reservation of power to the chief of the bureau and the director of the department of public works is further set forth in the eighth clause of the twenty-ninth section of the specifications, under the head of " General Items,"

which provides that: " No claim shall be made for extra work unless the same shall have been done in pursuance of a written order from the chief of the bureau, approved by the director of the department of public works.    The value of any extra work is to be determined by the chief of the bureau, and when approved in writing by the director of the department of public works, shall be final and binding upon the parties hereto ; " and further: " All claims for extra work must be made to the director of the department of public works in writing before the payment of the next succeeding estimate after the work shall have been done."    No claim for extra work has been made under the contract sued on here, and I have only stated these sections as illustrating still further the general power of the director of the department of public works, and under him the chief of the bureau of water, under the contracts in this case.

The tenth clause of the twenty-ninth section, under the head of " General Items," is also very important.    It provides as follows : " The chief of the bureau of water, subject to the final approval of the director of the department of public works is to be the judge of work and material in respect of both quality and quantity, and their decisions in all questions in dispute in regard to the work or material furnished, or as to the meaning of any part of these specifications, shall be final and binding on all parties.    All materials and workmanship shall be subjected at all times to a rigid inspection."    Under this interpretation of the law, and as the contract is a written one, the interpretation is for the court, and not the jury.    [I instruct you that any changes made by the chief of the bureau of water and approved by the director of the department of public works were lawful changes, and that you would not be justified in finding a verdict for the defendant, simply because the contractors carried out and adopted changes of plans that were deemed advisable.] [7] And without elaborating further in reference to the interpretation of this contract in this respect, [I shall call your mind back again to what I instructed you in the beginning of my charge was the law of Pennsylvania in regard to the substantial performance of a work, and again remind you that it will be your duty to determine whether or not under the evidence in this particular case there has been a substantial performance by the contractors, and you must determine from the evidence whether

they have faithfully and honestly endeavored to perform their work. If they did they are entitled to recover the contract price of the work. If they did not, they are not entitled to recover.] [9] The plaintiffs, upon whom rested the burden of showing a substantial performance of that which they agree to do, called a very great number of witnesses. They called, after they had proved the more formal matter in reference to the execution of the contract, Mr. Kennedy Crossan, who was one of the contractors, and who had personal charge and supervision of the whole work of excavation and construction of the embankment and so on, and he was examined and cross-examined at. length. They called, also, Dr. L. S. Filbert, another of the contractors, who had charge of the construction of the concrete, and he was examined and cross-examined at great length. You had an opportunity to judge from their examination and cross-examination, as to whether or not they fulfilled their contract, or endeavored to fulfill it, in strict and exact accordance with the specifications and plans, or whether they failed in that duty. And besides these witnesses the plaintiffs called Mr. Amasa Ely, the city engineer in charge, whose sudden death during the course of the trial caused us all such a shock, and who appears to have been a painstaking, conscientious, and honest official. It is perhaps no part of my judicial duty to have said this, but, if it be error it is human error to speak well of one whom I never saw to my knowledge until he sat in the witness chair, but who impressed me as a straightforward, honorable man. Then the plaintiffs called the people who were concerned, the assistant engineers of the city and the foreman in charge of the gangs who were constructing the work, and also called the inspectors who were placed there to inspect the work and materials on behalf of the city. The plaintiffs called, also, the persons from whom they purchased the materials which went into the construction of the Queen Lane reservoir. I do not know whether all the inspectors were called, but during the course of the trial I think it was stated by counsel for plaintiffs, and admitted by counsel for the defendant, that eleven of them had been called who were alive. It would, I think, rather hinder than aid you in coming to a correct conclusion upon the evidence, if I were to endeavor to make an analysis of the great mass of testimony that was submitted. You are the proper

judges of that testimony in respect to its credibility, and to the weight which you should give it.  You have come from the main body of citizens to determine these questions of fact, and you are to decide them as you judge of them in the ordinary transactions of life.  The question as to the credibility of witnesses, who is to be believed and who is not to be believed, is entirely for you.  Where there is a contradiction of testimony it is your duty to reconcile it if you can; if not, to decide between the witnesses as to who is telling the truth.  There were also called before you, both on behalf of the plaintiffs and of the defendant, expert witnesses, but I have endeavored, while admitting all testimony as to the facts in this controversy which I deemed to be relevant, to exclude mere opinions, because we have been trying, however important the case may be, to try the case in accordance with the same rules of law that should be applied on the trial of the case where the amount involved was less.  And I think the controversy in this case, in conformity with the law, should be determined by the jury upon the testimony as to the actual facts, and not by the opinion of men, however efficient and competent each may have been in his own line of scientific inquiry.

The defendant, the city of Philadelphia, in its behalf, also brought many witnesses, and they have given their testimony as to what they saw and knew about the facts in the case.  I do not propose to attempt any analysis of the testimony of the defendant.  It is fresh in your minds, and you have been most attentive in your duties, and where, as I said before, there is a conflict in the testimony, it will be your duty to decide it.  Nor do I propose to express the slightest opinion upon the character of the work or materials furnished, or upon the plans as they were originally designed, or as they were modified from time to time by the chief of the bureau and his engineers and assistants, with the approval of the director of the department of public works.  It is my duty to interpret the law, and in my opinion the contract made between the parties contains the rule by which they were to be guided in the performance of their contract and in the construction of the work, and that contract contains within its provisions the rules by which we are to determine, first what was agreed to be done, and, second, what was done.  The first question is one for me, and I have endeav-

ored to interpret the contract from time to time as I believe and understand the intention of the parties, as gathered from the contract itself. My interpretation of that contract has been shown from time to time by my rulings on the evidence, and is, of course, subject to review by a higher tribunal. I have endeavored to interpret the contract, also, in accordance with what I understand to be the law of Pennsylvania.

And now, gentlemen of the jury, I ask you to render your verdict without fear and without favor. Let there be no sympathy, but no prejudice. Let no consideration move you but a simple determination to decide according to the evidence. If you do so, your verdict will be approved by your consciences, and a higher standard cannot be set for any man.

Defendant's points and answers thereto among others were as follows:

4. If the jury believe the testimony of the director of the department of public works, that after the reservoir was tested by water being pumped into it he declined to accept it, no inference of acceptance can arise from any previous approval of the work; and, if they further believe that it was not so constructed as to make it the duty of the city to accept and pay for it, your verdict should be for the defendant. *Answer:* That point I decline. [11]

6. As the plaintiffs agreed to make a " complete and perfect reservoir, ready for use," they warranted that the reservoir would fulfill the purpose for which it was intended; and if the jury believe that the plaintiffs did not make a " complete and perfect reservoir, ready for use," then the verdict must be for defendant. *Answer:* That point I decline. [1]

7. If the jury find that the plaintiffs agreed to furnish a complete and perfect reservoir, ready for use, upon the site chosen, which was made known to and examined by them, and if the jury find that the reservoir furnished the city was not complete and perfect, or was not ready for use, plaintiffs have not fulfilled their contract and are not entitled to recover in this suit. No fault or defect in the ground can excuse performance. *Answer:* That is declined. It is a question for the jury under the whole evidence to determine whether the failure of the reservoir to hold water, if there was any failure, was due to any defective work on the part of the contractors or not. [2]

8. Any changes or alterations made by the director of the department of public works in the written contracts, plans and specifications for the construction of the said reservoir were unauthorized and were not binding on the defendant. *Answer:* That point is declined. [5]

9. Any oral changes or alterations made by the director of the department of public works in the written contracts, plans and specifications were unauthorized, and were not binding on the defendant. *Answer:* I answer that point by reading the seventh clause of the twenty-ninth section : " The contractor is bound to adopt any change of plans that may be deemed advisable, and an allowance shall be made for or against him as the case may be, the amount of such allowance to be determined by the chief of the bureau of water, and approved by the director of the department of public works, and stated in writing previous to the work being constructed. Such alterations will not annul the contract excepting as to such altered parts." *Answer:* I decline that point. [6]

16. If the jury find that plaintiffs did not substantially perform their contract, and did not, on or before January 1, 1895, deliver to the defendant a complete and perfect reservoir, ready for use, according to their contract, then the plaintiffs are not entitled to recover, and your verdict should be in favor of the defendant, awarding a certificate in the sum of $100,000, the amount agreed upon in the contract as damages for the failure of the plaintiffs to properly comply therewith. *Answer :* That is declined. [12]

17. Under all the evidence in this case, your verdict should be for the defendant. *Answer :* That is declined. [14]

Verdict and judgment for plaintiffs for $137,070.92. Defendant appealed.

*Errors assigned* among others were (1, 2–5, 6, 7–9–11, 12–14) above instructions, quoting them.

*James Alcorn*, assistant city solicitor, with him *J. W. Catharine* and *John L. Kinsey*, city solicitors, for appellant.—Where a person expressly or impliedly undertakes, without any qualification, to do a certain thing, he is not excused from liability, though performance be rendered impossible by some unforeseen

cause over which he has no control: Hare on Contracts, 652,
Dermott v. Jones, 2 Wallace, 1; School Trustees v. Bennett, 3
Dutcher, 513; Railroad Co. v. Smith, 21 Wallace, 255; R. R.
v. Reichert, 58 Md. 261; Thorn v. Mayor of London, L. R. 1
Appeal Cases, 120; Dubois v. Bigler, Young & Co., 95 Pa. 203,
Pennypacker v. Jones, 106 Pa. 237; Dixon-Woods Co. v. Phillips Glass Co., 169 Pa. 167.

The city officers had no power to make the changes : Malone
v. Philadelphia, 147 Pa. 416; Hepburn v. City, 149 Pa. 335.

If the judgment of the lower court be sustained, the city will
be at the mercy of its officials. as contracts made by the city
with all the solemnities required by law would be ineffectual,
if they could be so readily and easily altered: Hague v. Phila.,
48 Pa. 527; Lehigh County v. Kleckner, 5 W. & S. 181; Addis
v. Pittsburg, 85 Pa. 379.

To entitle the appellees to recover the full or exact contract
price, they must show exact performance of the contract, and
for any less performance, they can only recover the contract
price, less such deductions as the jury find should be made by
reason of any deficiencies: Monocacy Bridge Co. v. American
Iron Bridge Mfg. Co., 83 Pa. 517; Moore v. Carter, 146 Pa.
492; Sticker v. Overpeck, 127 Pa. 446; Gallagher v. Sharpless,
134 Pa. 134; Holmes v. Oil Co., 138 Pa. 546; Wilkinson v.
Becker, 155 Pa. 194.

In the absence of the final acceptance by the director the
appellees were required to show that they had so constructed
the reservoir as to make it the duty of the city to accept and
pay for it: Singerly v. Thayer, 108 Pa. 291; Boiler Works v.
Schnader, 155 Pa. 394; Hartupee v. Pittsburg, 97 Pa. 107.

When, independently of the stipulation the damages would
be wholly uncertain and incapable, or very difficult, of being
ascertained, except by mere conjecture, then the damages will
usually be considered liquidated: Kelso v. Reid, 145 Pa. 606;
1 Sedgwick on Measure of Damages (8th ed.), 549.

Where the court fails to direct the attention of the jury to
the several matters in issue between the parties, and to instruct
them on the law involved in their determination, the charge is
inadequate and ground for reversal: Richards v. Willard, 176
Pa. 181; Herrington v. Guernsey Bros., 177 Pa. 175; Lerch v.
Bard et al., 177 Pa. 197; Reichenbach v. Ruddach, 127 Pa.

564; Herstine v. Railroad Co., 151 Pa. 244; Peirson v. Duncan, 162 Pa. 187; Heydrick v. Hutchinson, 165 Pa. 208; Tietz v. Traction Co., 169 Pa. 516.

*John G. Johnson*, with him *Henry F. Walton* and *A. S. L. Shields*, for appellees.—If the contractors for the Queen Lane reservoir had undertaken to erect a reservoir upon the site, and if they had been unable to erect the same because of a yielding of the foundations during the progress of construction, they would not have been entitled to their money. They accomplished what they undertook, however. They did erect a reservoir upon the site. They completed it in exact accordance with the plans and specifications. The duty of the city to pay the stipulated price was not affected by the fact that thereafter, in consequence of difficulties in the foundation, the reservoir failed to accomplish what had been expected: Dermott v. Jones, 2 Wallace, 1; R. R. v. Smith, 21 Wall. 255; Hare on Contracts, 647; Johnson v. Freemann, 160 Pa. 317; Lovering v. Buck Mountain Coal Co., 55 Pa. 291; Miller v. McKeesport, etc., Ry., 179 Pa. 350; Coon v. Citizens Water Co., 152 Pa. 644; In re Freel, 42 N. E. Rep. 586; Weld v. Goldenberg, 26 U. S. Appeals, 491; Gallagher v. Sharpless, 134 Pa. 134; McCauley v. Keller, 130 Pa. 53; Sticker v. Overpeck, 127 Pa. 446; Monocacy Bridge Co. v. American Iron Bridge Mfg. Co., 83 Pa. 519; Wilkinson v. Colley, 164 Pa. 40.

OPINION BY MR. JUSTICE FELL, May 27, 1897:

The two main propositions upon which the appellant relies are: (1) that the plaintiffs' obligation was not fulfilled by the construction of a reservoir in exact compliance with the terms of their contract with the city, but that they were bound to construct a reservoir through which water would not penetrate; (2) that the director of public works had no power to make any change in the plans and specifications, and that for a construction made in compliance with the changes directed by him, there could be no recovery. To answer these propositions we must consider the terms of the agreement, the cause of the defects alleged, and the character of the changes which were directed.

The plaintiffs entered into a contract with the city to con-

struct a reservoir on a tract of land containing about sixty-five acres, for the sum of $1,159,591. The general agreement and the plans and specifications which were made a part thereof, together contain the most elaborate details as to the kind of work to be done and the materials to be furnished.

The director of the department of public works is given the right to reject materials or work if unsuitable or defective; to supply other materials and employ other contractors or workmen in case the work should be done defectively or not prosecuted diligently; and, as between the contracting parties, he is made the sole judge of the quality and quantity of the work done and materials furnished, and of the meaning of any part of the specifications. The contract provides that the materials shall be furnished and the work performed "in strict and exact accordance with the plan on file in the department of public works and the specification hereto attached." The provision for changing the contract is as follows: "The contractor is bound to adopt any change of plans that may be deemed advisable, and an allowance shall be made for or against him, as the case may be, the amount of such allowance to be determined by the chief of the bureau of water and approved by the director of the department of public works and stated in writing previous to the work being done. Such alterations will not annul the contract except as to such altered parts." In the specifications under the head of "Approximate Quantities," and following a detailed statement of the amount of excavation to be made and of materials of various kinds to be furnished, is this sentence: "The quantities are approximate only, and the director of the department of public works reserves the right to increase or diminish them as he may deem necessary." Under one of the thirty subheads in the specifications, the work to be done is named in one sentence as the tearing down and removal of buildings, etc., the making of excavations, the construction of embankments and roadways, the seeding and sodding of the grounds, the building of walls, the lining of the interior slope, the building of walks and stop-houses, the removal of all surplus material, "and all work necessary to make a complete and perfect reservoir ready for use and to leave the grounds in a suitable condition." The last clause of this sentence, which closes a description of the numerous things to be done in the construc-

tion of the reservoir and the ornamentation of the grounds with the general statement " and all work necessary to make a complete and perfect reservoir ready for use and to leave the grounds in a suitable condition," is the basis of the contention that it was the duty of the contractors to turn over to the city a reservoir that would not leak, although the one they constructed and delivered was in exact accordance with the plans and specifications. The leaking of the reservoir appears to have been due to the insufficient thickness of the clay bottom. The clay used would have been sufficient if it had rested upon solid rock; but the foundation of the reservoir was micaceous rock which contained fissures, through which the water which percolated through the clay found an outlet. This defect in the reservoir was not due to defective material or workmanship in its construction. To hold the plaintiffs answerable for it would be to hold them as warranting that the reservoir should be a perfect reservoir, notwithstanding that its defects might be due entirely to its site or to the specifications. This is precisely the position taken by the city, and it cannot be sustained.

The contract does not admit of such a construction. It was not at any time a fixed and certain contract, as the city through her officials could make any changes which were deemed necessary, and the contractors were bound to build as directed. The words, " all work necessary," etc., follow the enumeration of the things to be done, and they were doubtless intended to cover points of construction which might have been overlooked, or which might afterwards be found to be necessary, or which could not then be specified, as the working plans had not been completed. The contractors were given no discretion. Every line was drawn, every grade was fixed and every detail was provided for by the city. If the contractors had thought it wise to depart from the plans, and had done so and built a better reservoir, they could have recovered nothing. There would have been a deliberate and wilful departure from the terms of the contract which would have defeated their entire claim for the price. We cannot conclude that, under an agreement which might be changed from time to time, and in which the only certain thing was that materials should be furnished and work performed " in strict and exact accordance with plans and specifications " prepared or to be prepared thereafter by the

city, it was intended that the contractors should do more than make a reservoir complete and perfect according to the plans and specifications furnished. The words "all work necessary to make a complete and perfect reservoir ready for use," found at the end of one of the specifications in which the kind of work to be done is described, when read in connection with other parts of the agreement, do not indicate an intention that the contractors were to be responsible for the result if there was no default on their part.

This is not the case of an undertaking absolutely to construct a particular thing, or to construct a thing according to plans furnished by the builders, or of a failure because of accident to the works or the sinking of the foundation on which the structure was to stand. The failure to obtain the result desired was not owing to the failure to do the work as agreed, but to causes over which the plaintiffs at no time had control.

By ordinance the director of the department of public works was instructed to prepare plans and specifications and to award the contract for the construction of the reservoir. The contract prepared by him and approved by councils bound the contractors to adopt any change of plans that might be deemed advisable, the allowance in cost for or against them to be determined by the director, and full power was given the director to increase or decrease the amount of excavation and of materials of all kinds specified. The contract authorized and entered into reserved to the city the privilege of making changes in its terms as the work progressed, and either by expression or by direct and necessary implication the director of public works was empowered to make such changes, and was constituted the sole arbiter to determine the meaning of the specifications, and whether they had been complied with. As to the wisdom of delegating the power to change municipal contracts much might be said on either side. The delegation of such a power furnishes the opportunity for its abuse, but it seems to be almost essential to the prosecution of works of great magnitude. It is not the experience of life that large confidences are betrayed more frequently than small ones. It is conceded in this case that the changes were honestly made for the benefit of the city. The important changes made were suggested by the experience the department had had with other reservoirs after the contract

was entered into, and none of them increased the cost of the work. But we are concerned with the question of power only. We are not dealing with alterations in a contract made without authority, or which radically change the general character of the work, but with those expressly authorized and provided for, which concerned only the details of construction. If the contract had not permitted changes it would not of course have been within the power of the director to make them, but we see no reason to doubt the power of the city to provide in the contract for such changes as were made and to authorize the director to make them.

The learned judge in his charge clearly stated the law as to substantial performance and instructed the jury that if there had been no wilful departure from the contract or omission in essential points, and the contractors had honestly and faithfully performed their contract in its material and substantial particulars, a forfeiture of the right of remuneration would not arise by reason of merely technical, inadvertent or unimportant omissions or defects, and under the evidence in the case we cannot say that there was any error in refusing the defendant's fifth point. The instruction asked for was that if there had been substantial but not strict performance the defendant was entitled to such a deduction as would compensate for deficiencies. Where there is a recovery for substantial performance notwithstanding defects, there should be a deduction as a compensation to the defendant: Monocacy Bridge Co. v. Am. Iron Bridge. Mfg. Co., 83 Pa. 517. But there must be proof as a foundation for the claim for an allowance. The learned trial judge, in answering the point, said that the law was correctly stated, but that there was no evidence of the cost of repairs, and our attention has been directed to none which would have justified an allowance on any ground.

The judgment is affirmed.


CONCURRING OPINION BY MR. JUSTICE WILLIAMS:

I concur in this judgment, but I feel bound to put my reason for such concurrence on the record. A city, like a natural person, is bound by its improvident contracts, after performance by the other party, unless fraud is shown. This judgment can be sustained only upon that ground. As originally drawn the

specifications for the Queen Lane reservoir were all that could be desired for the protection of the city; and the contract, with the exception of a single provision, was wise and adequate. But the objectionable provision put the stipulations of the contract and the well drawn specifications under the power of certain officers. They were empowered to supervise, which was proper enough, but they were also empowered, as they held, to change the terms of the contract at will, to add to or diminish the work required by the specifications, increase or diminish the quantity or the character of materials used, and readjust the compensation of the contractors and the cost to the city without the consent or knowledge of the municipality, and without responsibility for the consequences. Under this provision great changes were made in this contract. The testimony shows that these changes are responsible for the worthlessness of the reservoir, and the waste of hundreds of thousands of dollars in repairs.

The appellees say in their argument: " The chief of the bureau of water, therefore, naturally endeavored to economize. The result of his economy was the specification of a depth of clay bottom insufficient for the purpose. The water, therefore, penetrating through this insufficient clay bottom sank into the fissures of the rotten or micaceous rock and found its way in natural channels, thus manifesting the so-called leaks." Reducing the thickness of the bottom reduced its power to hold water and changed a material provision in the contract.

Changes made in the contracts of the city should be made only by the city. The municipality ought never to attempt, nor if the question be properly raised has it the legal right, to abdicate its functions and invest an officer with unlimited power over its contracts, and the pockets of its tax-payers. It does not seem to be doubted that these changes were honestly made, and as the result of mistaken advice from subordinate officers. They were none the less disastrous on that account. The city must pay enormously because of changes that were wholly unnecessary, and that, as the event shows, ought never to have been made. The vice is in the provision to which we have referred, and it ought never to appear again.

STERRETT, C. J., concurs in the foregoing opinion.