Mannella *v.* Pittsburgh, Appellant.

Argued March 29, 1939. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN and STERN, JJ.

*Anne X. Alpern,* First Assistant City Solicitor, with her *Wm. Alvah Stewart,* City Solicitor, for appellant.

*Harry A. Estep,* for appellee.

OPINION BY MR. JUSTICE STERN, May 8, 1939:

Mike Mannella, plaintiff, entered into a written contract with the City of Pittsburgh, defendant, to lay a 36-inch waterpipe servicing the South Side district. To the extent of about 800 feet the line was to rest in a trench at the bottom of, and crossing, the Monongahela River. The work proceeded satisfactorily until the laying of the pipe under the river had been finished. In order to permit of an inspection the pipe was then partially drained by a siphoning operation, during the course of which it floated, buckled at the flanges, and broke. This made necessary a repairing and relaying job, at an expense to plaintiff, as alleged by him, of $28,098.61, to recover which (together with a small item for other work not here involved) the present action was brought. The jury returned a verdict in favor of plaintiff in the amount of his claim, and judgment was entered thereon.

The principal issue at the trial was whether plaintiff or defendant was the party legally responsible for the cost of repairing and relaying the damaged pipe. This depended partly upon a factual controversy, which was resolved by the verdict of the jury, and partly upon the proper interpretation to be given to certain clauses of the agreement.

Originally the contract provided that after the pipe had been laid and connected it should be weighted by placing concrete around it, but during the course of the work plaintiff suggested to defendant the elimination of this requirement and the allowance in return of a credit on the contract price, to which defendant agreed. In his letter making the offer plaintiff wrote: "I propose to backfill the trench over the pipe before pumping out the line for inspection and will re-excavate if necessary to repair any leaks that the final test may reveal. It is understood that this omission, if allowed, will in no way affect my responsibility for the line nor my obligation to pump same out for inspection."

It was stipulated in the contract that each "laying length" of the pipe, before being placed, should be tested with water to a certain specified pressure, and a water-pressure test should again be made after the pipe had been laid and the field joints made; if excessive leakage appeared defendant reserved the right to require that the pipe should be given an air-pressure test. The water-pressure tests were made, including one after the laying of the pipe had been completed; they showed no appreciable leakage and the city engineers were satisfied with the results. Some air tests were also made during the progress of the work, and it was demonstrated that the pipe was water-tight. In accordance with a provision of the contract a cofferdam was constructed at the north end where the pipe emerged from the river and from where it was to rise at a vertical angle for connection with the city water system.

When this point in the work was reached certain conversations occurred between the parties which gave rise to the present controversy. Since a jury has placed its stamp of approval upon plaintiff's version, although it was vigorously contradicted by defendant's witnesses, the facts as claimed by plaintiff must here be accepted as true. Plaintiff says that he was told by the inspector on the job "to pump the line," to which he replied, "If

you do that the line will float." Subsequently he was instructed by the managing engineer of the Bureau of Water that he should "go ahead and take 14 to 16 inches of water out of that line because we got it all calculated to do it all right"; plaintiff answered that he did not "think it was a good move to make," that he considered it dangerous, and that "if I pumped that line out, she will float." One of the city engineers who had charge of the construction work said to him: "You take 14 inches of water out of that line. You are safe. We got him all calculated. Go, take it out." Later, another of the field engineers gave orders, in the absence of plaintiff, to plaintiff's construction superintendent, either to pump the line out or not proceed any further with the work, to which the superintendent strongly demurred, but he referred the matter to plaintiff, who told him that if they insisted on it he should "go ahead." It is reasonably clear from the testimony that this order for draining the pipe to the extent of 14 inches was ill-advised, and that the direct result of its execution was the floating and breaking of the pipe.

We have here, then, a situation comprising the following circumstances: a contractor is ordered by duly authorized representatives of the owner—in this case the City of Pittsburgh—to do a certain act in connection with the work under construction; the propriety of the order is a matter of expert judgment; the contractor believes that it involves danger but he is overridden by the city's technical engineers; although he has an opinion on the subject he has no absolute *knowledge* that the operation ordered will prove disastrous; he bows to force majeure in the shape of peremptory orders given by the city; by the terms of the contract he is required to comply with the orders he receives, there being a provision that "the orders of the Director shall be obeyed by the party of the second part [the contractor] and by all persons employed on the work," the "Director" being defined as "the Director of the Department of Public Works of the City of Pittsburgh,

Pa. or his Managing Engineer, Assistants and Inspectors, limited by the special duties entrusted to them." It is established that ordinarily a contractor is not responsible for defects caused by acts or orders of the owner during the progress of the work: *Hogg v. Jackson & Sharp Co.*, (Md.) 26 A. 869; *Iron Clad Mfg. Co. v. Thomas B. Stanfield & Son*, 112 Md. 360, 76 A. 854; *Siebert v. Leonard*, 17 Minn. 433; *Murphy v. Kassis*, 59 N. Dak. 35, 39, 228 N. W. 449, 450; *Bryant v. Stilwell*, 24 Pa. 314, 319; *Rohrman v. Steese*, 9 Phila. Rep. 185.[1]

The present controversy thus resolves itself into the question whether there is in this particular contract any assumption of liability by plaintiff which takes the case out of the general rule. Defendant contends that it had the right to demand the dewatering of the pipe when it did, and that plaintiff was bound to repair any resulting defects, and in support of this position points out a clause in the contract which provided that "the coffer-dam shall be made reasonably tight and the contractor shall keep the water pumped out from same so that the pipe can be laid, joined, tested and inspected in the dry," another clause that, "before emptying the pipe or making an air test, the contractor shall make such further provisions as he deems necessary against damage from flotation or any other cause during the test; the con-

---

[1] The cases are uniformly to the effect that a contractor who builds according to the plans and specifications is not responsible for results: *Filbert v. Philadelphia*, 181 Pa. 530, 545, 546; *James H. Harlow & Co. v. Borough of Homestead*, 194 Pa. 57, 60; *Wiggins v. Columbian Fireproofing Co.*, 227 Pa. 511, 520; *Tate-Jones & Co., Inc., v. Union Electric Steel Co.*, 281 Pa. 448, 453; *Canuso v. Philadelphia*, 326 Pa. 302, 309; *Riebe v. Mauch Chunk Water Co.*, 33 Pa. Superior Ct. 321, 324. If the owner, during the course of the work, gives an order under which the contractor proceeds, this is equivalent in effect to an agreed change in, or interpretation of, the original plans and specifications; if, therefore, the carrying out of the order, without negligence on the part of the contractor, results in defects or damage to the work, the contractor should no more be held responsible therefor than in the case of his proceeding under the original plans and specifications.

tractor shall be entirely responsible for any such damage and shall make same good, by repairs or renewal, in such a manner as to satisfy the Director that the work is in first class condition when it is completed," still another clause, that "all precautions that are necessary to avoid absolutely any injury to the pipe or its protective covering shall be taken by the contractor and any damage done to the pipe or covering shall be repaired by the contractor at his own expense, in a manner satisfactory to the Director," and, finally, a clause that "the contractor shall take every precaution against the floating of pipe in trench. . . . In case of such floating, he shall replace the pipe at proper grade at his own expense, and make wholly good any injury or damage which may have resulted." It would seem clear that the provision as to inspection "in the dry" was intended to refer, not to a draining of the pipe, but to an inspection, free of surrounding water, only of that portion which was within the cofferdam, since the same sentence deals also with the laying and joining of the pipe, which obviously could not, as to the *whole* line, be done "in the dry." Conceding, however, as plaintiff apparently does, that the contract should be interpreted as giving defendant the right to call for a draining of the pipe at *some* time in order to permit of its inspection, there is nothing to indicate that such dewatering could properly be demanded except immediately before the final approval and taking over of the pipe line by defendant and after the trench had been backfilled around and over the pipe as proposed by plaintiff in his letter previously quoted, and not at some inauspicious period when such an operation would involve likely danger. The clauses in which plaintiff agreed to repair damage to the pipe and, in case of its floating, to replace and restore it, cannot be construed to apply where the floating and damage resulted from the city's arbitrary insistence upon an inspection being made at an impractical time, especially since admittedly the object of the dewatering ordered

by defendant was not to test the pipe, but, before it was connected with the ascending section, to enable inspectors to look through part of it with a flashlight in order to see whether it contained any floating debris, which plaintiff contends was a wholly whimsical purpose which could have been effected far more satisfactorily by some other method.

Plaintiff, as in *Jackson v. McKeesport,* 305 Pa. 198, 200, did the repair work under protest, there being a clause in the contract that if the Director notified the contractor to make repairs the latter was bound immediately to commence and complete the same. Plaintiff reserved the right to make a claim for the expense incurred. Defendant argues that the repairs were "extra work" and that no recovery for them can be had because not made under a written order of the Director and because the claim was not presented within the time specified in the contract in regard to claims for extra work. The answer to this contention is that the repairs did not represent extras in the sense of work not contemplated in the plans and specifications, but additional labor and material necessary, by reason of defendant's act, to complete the job in accordance with the *original* plans and specifications.

A consulting civil engineer, testifying as an expert on behalf of plaintiff, was allowed to give his interpretation of the provisions of the contract. Theoretically, defendant's objection to this testimony is well founded, for it was the duty of the court itself to construe the agreement. As it happens, however, the witness did not make any statements by way of legal interpretation or construction of the contract which did not accord with the views adopted by the court below and now by this court, so that no harm resulted to defendant.[2] Objec-

[2] Commenting upon this testimony as it applied to an interpretation of certain correspondenec between the parties, the trial judge said, while the witness was on the stand: "I think everybody could get that interpretation. There will be no dispute about that." Counsel for defendant offered no dissent to this pronouncement.

tion was also made to this witness being allowed to testify that in the course of negotiations for the purpose of adjusting plaintiff's claim the city had admitted that the expenses of plaintiff in repairing and relaying the pipe amounted to $16,000. The witness did not assert that defendant conceded liability for that or any other amount, but merely that it had admitted that the cost of the labor and material used in the job amounted to that sum, which was considerably less than the amount claimed by plaintiff. While an offer to pay a sum of money to compromise a dispute is not admissible in evidence to prove that the sum offered was admitted to be due, the distinct admission of a fact is not to be excluded because it was accompanied by an offer to compromise the suit: *Sailor v. Hertzogg*, 2 Pa. 182, 185, 186; *Arthur v. James*, 28 Pa. 236; *Bascom v. Danville Stove & Manufacturing Co.*, 182 Pa. 427, 441; *Rabinowitz v. Silverman*, 223 Pa. 139.

The judgment is affirmed.