**TURKISH STATE RAILWAYS ADMINISTRATION, Plaintiff,**

v.

**VULCAN IRON WORKS, Defendant.**

**Civ. A. No. 4877.**

United States District Court
M. D. Pennsylvania.
July 1, 1957.

See also 136 F.Supp. 622.

Nauman, Smith, Shissler & Hall, Harrisburg, Pa., Cummings, Stanley, Truitt & Cross, Washington, D. C., for plaintiff.

Paul Bedford, Wilkes-Barre, Pa., William T. Kirby, Chicago, Ill., for defendant.

JOHN W. MURPHY, Chief Judge.

Defendant moves (a) to dismiss, (b) for a more definite statement. Fed.Rules Civ.Proc. rule 12(b, e), 28 U.S.C. The more drastic remedy is denied. Sherwin v. Oil City National Bank, 3 Cir., 1956, 229 F.2d 835, at page 837; United States v. Employing Plasterers Ass'n of Chicago, 1954, 347 U.S. 186, 74 S.Ct. 452, 98 L.Ed. 618.

To the pleadings is assigned the task of general notice giving; the task of narrowing and clarifying the basic issues, ascertaining the facts relative to those issues, is the role of the deposition-discovery process aided by the pre-trial hearing. Hickman v. Taylor, 1947, 329 U.S. 495, 500, 67 S.Ct. 385, 91 L.Ed. 451; Metropolis Bending Co. v. Brandwen, D.C.M.D.Pa., 8 F.R.D. 296, 297; Porter v. Shoemaker, D.C.M.D.Pa., 6 F.R.D. 438.

Is the second amended complaint a short and plain statement of a claim showing that plaintiff is entitled to relief, Rule 8(a); Sierocinski v. E. I. Dupont De Nemours & Co., 3 Cir., 1939, 103 F.2d 843; Gold Seal Co. v. Weeks, 1954, 93 U.S.App.D.C. 249, 209 F.2d 802, at page 808; cf. Dioguardi v. Durning, 2 Cir., 1944, 139 F.2d 774; Smith v. Piper Aircraft Corp., D.C.M.D.Pa., 18 F.R.D. 169, at pages 173, 174; does it afford fair notice of the nature and basis of the claim or claims asserted and a general indication of the type of litigation involved, Continental Collieries, Inc., v. Shober, 3 Cir., 1942, 130 F.2d 631, at page 635; or is it in some respects so vague and ambiguous that defendant cannot be reasonably required to form a responsive answer thereto?

By written contract November 6, 1946, defendant agreed to manufacture and deliver to plaintiff at Wilkes-Barre in this district sixty-two steam locomotives at $115,000 each. March 8, 1947, a contract was executed for twenty-six additional locomotives at $129,000 each. The two contracts entered into pursuant to proposals submitted by defendant are identical except as to number of proposal, date, number of locomotives, price, and time of delivery. The locomotives were to be manufactured according to specifications and drawings prepared by defendant and certified by plaintiff. All eighty-eight locomotives were delivered.

Plaintiff seeks $1,175,248.70 for breach of contract and of warranty. In Count I for delay in making deliveries under the first contract, plaintiff claims a fine of $57.50 per day per locomotive for 2,027 days or $116,552.50. As to this count defendant does not press its request for a more definite statement asserting that sufficient information is already available; that it will plead the applicability of a "force majeure" clause in the contract, deny liability because of plaintiff's laxity in moving the locomotives and counterclaim for damages.[1]

The difficulty lies with Count II. Defendant guaranteed engine parts—wheel sets (axles and wheels), tires and springs —for three years; the rest of the material for one year.[2] If during the period of guarantee "hitches or trouble should arise out of faulty material or defective manufacture" defendant agreed at its own expense "to remedy the defect or, if necessary, replace all such parts at the earliest possible date * * *."[3]

Plaintiff avers that "during the period of such warranty and guarantee,[4] difficulties developed on each of the * * * locomotives * * * in that each of

---

1. In Count III plaintiff seeks to compel arbitration and by supplemental motion to stay proceedings under Counts I and II until arbitration is completed, but see memorandum opinion contra, D.C., 136 F. Supp. 622; 3 Cir., 1956, 230 F.2d 108, 110, "* * * to suggest that a plaintiff may invoke a chancellor's aid to enjoin himself from prosecuting his own lawsuit is indeed novel doctrine * * *."

2. Under normal working conditions. Defendant was not to be held responsible for damage done due to "intercrystalline cracking, caustic embrittlement, corrosion, scale or other deposits in the interior of the boiler" nor for "payment of consequential damages or expenses resulting from breakage and defects of the engine."

3. "To supply new material in place of defective material or broken or defective accessories due to faulty workmanship * * * CIF Istanbul." Defendant may ask plaintiff to fit accessory parts where special equipment was required.

4. For present purposes we consider the terms as synonymous. See 46 Am.Jur. Sales § 299; Tate-Jones & Co., Inc., v. Union E. S. Co., 1924, 281 Pa. 448, at page 454, 126 A. 813.

them was found to be defective due to faulty parts, materials and accessories and defective manufacture and workmanship", and that despite notice and demand defendant failed and neglected to remedy or replace such defective parts, materials and accessories as required by the contract.

In the original complaint plaintiff claimed $2,117,392.40 for breach of warranty, $1,058,696.20 under each contract in Counts II and III respectively, plaintiff's counsel advising by letter that $1,058,696.20 constituted their entire claim for breach of warranty but that they did not have sufficient information from Ankara to allocate the proper amount under each contract and therefore duplicated those items because they had to file their complaint to prevent the running of the statute of limitations.

After defendant moved for a more definite statement plaintiff's counsel visited Turkey and thereafter filed the present second amended complaint defining its claim in precisely the same language as the original but joining the claim as to each contract in a single count and adding that as a result plaintiff was obliged to remedy defects in or replace "336 driving wheel tires, 119 tender wheel tires, 88 engine wheel tires and tender wheels, 88 air brake pipes, 88 boilers and numerous stay bolts"[5] for which plaintiff claimed damages of $1,058,696.20 plus interest and costs.

Shortly thereafter plaintiff advised that its claim was made up as follows: Driving wheel tires, $24,024.00; tender wheel tires, $4,679.68; truck and tender wheels, $117,935.68;[6] air brake pipes, $3,146; stay bolts, $279,710.86; boilers, $629,200.

Defendant seeks to compel plaintiff to separate its claims as to each contract, specifying when the defects occurred, when they were repaired or replaced, stating what if any part constitutes special damages, F.R.Civ.P. Rule 9(g). Defendant contends that such relief is necessary so that it may plead the statute of limitations or failure to state a claim upon which relief can be granted.

While Rule 10(b) requires that "each claim founded upon a separate transaction or occurrence * * * shall be stated in a separate count * * * whenever a separation facilitates the clear presentation of the matters set forth", see 2 Moore Federal Practice, 2d Ed., § 10.03, we find, on further reflection and study, that since deliveries were made in part simultaneously under the two contracts, the contract terms are so similar that separation into counts would not facilitate clarity or solve the present difficulty.

Ordinarily, what difficulties within a generally defined area developed; when, whether they were due to faulty parts, materials or accessories, to defective manufacture or workmanship; whether they were repaired or replaced, and when; when and how notice was given and demand made, are proper subjects for discovery. Here the problem is not so simple.

 This being a diversity case, we look to Pennsylvania law to determine the rights and obligations of the parties. See and cf. Robt. H. Fox Co. v. Keystone Driller Co., 3 Cir., 1956, 232 F.2d 831, at page 834; Texas Motorcoaches, Inc., v. A.C.F. Motors Co., 3 Cir., 1946, 154 F.2d 91, at page 93. To recover plaintiff must show a breach within the warranty period. See and cf. Carr-Consolidated Biscuit Co. v. Moore, D.C.M.D.Pa.1954, 125 F.Supp. 423, at page 429. Defendant is not obliged to specially plead thereto under Rule 8(c). See and cf. Goodwin v. Townsend, 3 Cir., 1952, 197 F.2d 970; Matheny v. Porter, 10 Cir., 1946, 158 F.2d 478, 480; Kincheloe v. Farmer, 7 Cir., 1954, 214 F.2d 604, 605; A. G. Reeves Steel Const. Co. v. Weiss, 6 Cir., 1941, 119 F.2d 472, 476. An action to recover therein must be brought within six years from the date of the breach. Woodland Oil Co. v. A. M. Byers & Co.,

---

5. The third item appears to cover the same ground as the first two.

6. See note 3, supra.

1909, 223 Pa. 241, 72 A. 518; 6 Williston, Id. §§ 2004, 2020; Emich Motors Corp. v. General Motors Corp., 7 Cir., 1956, 229 F.2d 714, at page 719. As to pleading the statute of limitations, see Rule 8(c); Van Sant v. American Express Co., 3 Cir., 1947, 169 F.2d 355, at page 372; Emich Motors Corp. v. General Motors Corp., supra, 229 F.2d at page 717.

Deliveries were to commence December 28, 1947, on the first contract; to end June 30, 1948, on the second contract. Defendant asserts all deliveries were completed May 23, 1949. The last three payments under each contract were to be withheld to guarantee compliance. Once deliveries were completed under each contract (cf. Art. 8, Par. 11) the locomotives were to be put into working condition in Turkey and trials conducted. If those tests were satisfactory and the number of tools and accessories delivered with the locomotives found to be correct, a minute to that effect was to become adequate evidence of compliance. The period of guarantee was to begin one day after receipt of a report that the tests showed satisfactory compliance with the requirements. Nowhere in the pleadings, briefs, or arguments was there any indication of what that date was under each contract. Since it is so vital to plaintiff's claim, it should be ascertained, averred and ultimately proved. Such an averment would define the time limits within which a breach of warranty must have occurred and the time at which the statute of limitations commenced to run.

The locomotives were to be manufactured in accordance with technical specifications and with drawings prepared by defendant and certified by the plaintiff. During the course of construction, inspections and tests from the point of view of construction, quality and resistance of materials employed were to be made to determine whether they were in conformity with the technical specifications and approved drawings. Art. 8, Par. 2, provides that those inspections and tests should be final from the point of view of construction and quality of material employed.

Art. 9, Par. 7, provides that during the guarantee period the fact that faulty material had been previously inspected, its construction supervised and drawings certified did not exempt defendant from its responsibilities. Defendant agreed not to raise objections based on previous tests. Just how those two provisions are to be reconciled is a nice question. Defendant's position is that the proposals, specifications and drawings created a standard that it was obliged to meet and that it is not responsible if the locomotives met that standard. Further, that once plaintiff approved the construction, quality and resistance of materials defendant would be liable only if the material delivered was faulty, or as a result of defective manufacture or workmanship did not come up to the approved standards.

It appears from a reading of the original, first, and second amended complaints that in asserting "difficulties developed", in that each locomotive was found to be defective due to faulty parts, material and accessories and defective manufacture and workmanship, plaintiff was seeking to recover for breach of warranty because of defendant's failure to furnish parts, materials and accessories comparable to a standard, as warranted, and upon which the parties had agreed.

A study of the correspondence indicates that as of January 22, 1949, plaintiff repeated an earlier notice as to loosening of tires and advised defendant that twenty-five stay bolts had broken on each of twenty-four locomotives; that they considered such breaking to be a constructional fault and were charging them to defendant's account. Defendant replied that loosening of tires was due to improper braking methods by plaintiff's men and an inadequate number of brakes on cars, supporting its claim with an eight page report of a Westinghouse Air Brake Company expert. Further, that breaking of stay bolts was not due to any constructional fault; that the "boilers met ASME standards", Hartford Steam

Boiler Inspection, Insurance company tests and inspections.

September 1, 1949, in a fourteen page report, plaintiff divided its claims as follows: (1) Failure of stay bolts; (2) Loosening tires; (3) Truck and tender wheels; (4) Air brake conduits; (5) Short shipment of hoses and angle cocks. A report by defendant's engineering department replied item by item denying liability. April 21, 1951, plaintiff replied setting forth its claim under the same five items.

The original and first amended complaint filed July 7, 1954, asserts only that "difficulties developed" (see supra). The second amended complaint filed February 29, 1956, speaks of tires, wheels, air brake pipes, stay bolts and for the first time adds boilers. The memorandum of March 22, 1956, specifies money amounts as to each item.

It will be observed that plaintiff's claim for stay bolts, $279,710.86, and for boilers, $629,200 constitute the major portion of the alleged breach of warranty and that the warranty period on those items was one year.

It now appears from plaintiff's memorandum that its claim is not for failure to furnish stay bolts and boilers in compliance with defendant's quotations, specifications and approved drawings, comparable to an agreed standard, but that the boiler was of a faulty and inexpensive design which defendant should not have attempted; that the boiler did not meet the technical requirements of a locomotive boiler equipped with a fire box with radial stays; that the drawings were made upon an improper basis without proper consideration of an outmoded technique; that the boilers contain inflexible copper rather than flexible monel metal stay bolts. Plaintiff apparently claims damages for replacement of all 88 boilers and for the cost of replacement with stay bolts of a better quality, larger diameter and different material than those called for in the specifications, such replacements having been made in many instances before those inserted by defendant actually broke. Cf. Rule 9(c).

Defendant contends that the boilers were designed according to ASME rules; manufactured in compliance with specifications and approved drawings; where flexible stay bolts of a designated type were called for by the contract they were inserted as required. A boiler with all flexible stays in the breaking zone would have a lower maintenance cost but the initial cost would be much greater. Such type boiler was not included in plaintiff's quotations. On the boiler manufactured for plaintiff it is to be expected that some stay bolts in critical positions will break and need replacing until the fire box is properly heated and a permanent set obtained; finally, that it built boilers with copper fire boxes and copper stay bolts in accordance with those rules for the government of Spain with satisfactory results.

Defendant's position is that the warranty period as to the last boiler expired May 23, 1950. Plaintiff's total claim for damages as of late 1950 amounted to only $40,955.53. Defendant contends that faulty design was not included in the earlier complaint; that the statute of limitations expired before it was first asserted in the pleadings. When did the limitations period commence as to faulty design: from the date of the contract itself, or after reasonable time afforded for inspection and discovery?

Certainly plaintiff's claim has been given different emphasis if not placed in a substantially different area.

■ Do plaintiff's pleadings comply with the minimum requirements? We think not. "The cases are uniformly to the effect that a contractor who builds according to the plans and specifications is not responsible for results." Mannella v. City of Pittsburgh, 1939, 334 Pa. 396, at page 400, 6 A.2d 70, at page 72.

See Tate-Jones & Co., Inc., v. Union Electric Steel Co., 1924, 281 Pa. 448, at page 453, 126 A. 813, at page 815, " * * * the specifications—a part of the contract * * *—were prepared by the plaintiff, submitted to defendant, and the offer accepted. The builder was therefore bound to strictly comply with

the provisions set forth in constructing the furnaces, but, if this was done, he satisfied his obligation, and was not liable for results obtained, except as expressly or impliedly warranted. 9 C.J. 746; Filbert v. [City of ] Philadelphia, [1897] 181 Pa. 530, 37 A. 545; Harlow & Co. v. Homestead Borough, [1899] 194 Pa. 57 [at page 60], 45 A. 87; Wiggins v. Columbian Fire-Proofing Co., [1910] 227 Pa. 511 [at page 520] 76 A. 742"; Canuso v. City of Philadelphia, 1937, 326 Pa. 302, at page 309, 192 A. 133; and see The St. S. Angelo Toso, 3 Cir., 1921, 271 F. 245; The E. 270, D.C.D.Mass. 1927, 16 F.2d 1005, at page 1006; Tinius Olsen Testing Machine Co. v. Wolf Co., 1929, 297 Pa. 153, at page 159, 146 A. 541, 72 A.L.R. 718; Seitz v. Brewers' Refrigerating Machine Co., 1891, 141 U.S. 510, at pages 518–519, 12 S.Ct. 46, 35 L.Ed. 837, the only implication is that the machine would perform the work it was made to do; Pullman Palace-Car Co. v. Metropolitan St. Ry. Co., 1895, 157 U.S. 94, at page 107, 108, 15 S.Ct. 503, 39 L.Ed. 632; Roebling's Sons Co. v. American Amusement & Construction Co., 1911, 231 Pa. 261, at page 270, 80 A. 647; Albree v. Philadelphia Co., 1902, 201 Pa. 165, 50 A. 984; Weimer v. Clement, 1860, 37 Pa. 147, at page 149; 46 Am. Jur. Sales, § 352.

Cf. the language in Filbert v. City of Philadelphia, supra, 181 Pa. at page 545, 37 A. at page 546, "This defect * * * was not due to defective material or workmanship in its construction. To hold the plaintiffs answerable * * * would be to hold them as warranting that the reservoir should be * * * perfect * * *, notwithstanding that its defects might be due entirely to * * * its specifications," and that in Tate-Jones & Co., Inc., v. Union Electric Steel Co., supra, 281 Pa. at page 454, and see 455, 457, 126 A. at page 815, "It further contends that the designs, having been prepared by the plaintiff, there is an additional implied warranty that the work shall be done so that upon completion it may be used satisfactorily and economically, but this is not what the contract provided.

* * * There was no proof of any contemporaneous parol agreement broadening the responsibility of the plaintiff, which induced defendant to accept the proposal. We are not, therefore, concerned with alleged defects in design and workmanship, but only with the question as to whether the terms of the guaranty were complied with." As to pleading fraud, see F.R.Civ.P. 9(b). As to warranties, see 69 P.S.Pa. Tit. Sales, §§ 121 (express), 123 (implied), 124 (fitness), 258 (acceptance); Uniform Commercial Code, effective in Pennsylvania July 1, 1954: 12 A.P.S. §§ 2–313, 2–314, 2–315, 2–316, 2–317, 2–605, and Pennsylvania Annotations. As to warranty of fitness, see also Jones & Laughlin Steel Co. v. Wood & Co., 1915, 249 Pa. 423, at page 432 (but cf. Id. at page 425), 94 A. 1067; Wright v. General Carbonic Co., 1921, 271 Pa. 332, at page 336, 114 A. 517; Griffin v. Metal Product Co., 1919, 264 Pa. 254, at page 256, 107 A. 713. As to proper notice, see Wright v. General Carbonic Co., supra, 271 Pa. at page 337, 114 A. 517; and § 258, supra; Tinius Olsen Testing Machine Co. v. Wolf Co., supra, 297 Pa. 156, 157, 146 A. 541, and see and cf. Wheeling Stamping Co. v. Birdsboro Steel Foundry & Machine Co., 3 Cir., 1957, 245 F.2d 753.

"* * * It is well-settled law that if a thing be ordered of the manufacturer for a special purpose, and if it be supplied and sold for that purpose, there is an implied warranty that it is fit for that purpose. But this principle is limited to cases where a thing is ordered for a special purpose, and must not be applied to those where a special thing is ordered, although this be intended for a special purpose." Hill & MacMillan, Inc., v. Taylor, 1931, 304 Pa. 18, at page 21, 155 A. 103, 75 A.L.R. 1022. "* * * but this rule is subject to the qualification that the buyer relies upon the skill, judgment, or experience of the seller." 46 Am.Jur. Sales, § 346, p. 529.

"As a general rule, notwithstanding goods are sold for a particular use, if the buyer himself understands what he wants and has a full opportunity to ac-

quire a knowledge of any fact necessary to enable him to form a correct estimate, and selects such goods as he deems adapted to the intended use, there is no warranty of their fitness for such use." 46 Am.Jur. § 348, p. 532. " * * * where a known, described, and definite article is ordered of a manufacturer, although it is stated to be required by the purchaser for a particular purpose, still, if the known, described, and defined thing be actually supplied, there is no warranty that it shall answer the particular purpose intended by the buyer * * *." Jarecki Mfg. Co., Ltd. v. Kerr, 1895, 165 Pa. 529, at page 534, 30 A. 1019, at page 1020; 44 Am.St.Rep. 674; see Williston on Contracts, Rev.Ed., Vol. 4, §§ 989, 990; 46 Am.Jur. Sales, §§ 349, 353; and see Frigorifico Wilson De La Argentina v. Weirton Steel Co., 4 Cir., 1933, 62 F.2d 677.

"Where an article is ordered for a particular purpose, even though the seller is the manufacturer, the implied warranty of fitness does not extend beyond an obligation on his part to furnish an article reasonably fit for the disclosed purpose, and does not impose on him a duty to furnish the best article of its kind. * * * an implied warranty of the fitness of a machine to do a particular work does not include a warranty that it will do the work as rapidly or economically as some other specified machine. Such a covenant can be introduced only by express contract. 46 Am. Jur. Sales § 350; Davis Calyx Drill Co. v. Mallory, 8 Cir., 1905, 137 F. 332, at pages 334, 338, 69 L.R.A. 973.

"The raising of an implied warranty of fitness depends upon whether the buyer informed the seller of the circumstances and conditions which necessitated his purchase of a certain character of article or material, and left it to the seller to select the particular kind and quality of article suitable for the buyer's use." Davenport Ladder Co. v. Edward Hines Lumber Co., 8 Cir., 1930, 43 F.2d 63, at page 67; Texas Motorcoaches v. A. C. F. Motor Co., supra, 154 F.2d at page 93.

"The existence or nonexistence of an implied warranty of fitness for a particular purpose must, and necessarily does, depend upon whether the buyer relies upon the skill or judgment of the seller * * *." 46 Am.Jur. Sales § 348, pp. 532–533; Texas Motorcoaches v. A. C. F. Motor Co., supra, 154 F.2d at page 93; Demos Construction Co., Inc., v. Service Supply Corp., 1943, 153 Pa. Super. 623, 627–628, 34 A.2d 828; Hartford Battery Sales Corp. v. Price, 1935, 119 Pa.Super. 165, at page 170 et seq., 181 A. 95; Maryland Cas. Co. v. Independent Metal Products Co., 8 Cir., 1953, 203 F.2d 838, at page 844.

Finally, see and cf. Bechtold, to Use of Heating Service Co. v. Murray Ohio Mfg. Co., 1936, 321 Pa. 423, at page 430, 184 A. 49; 164 A.L.R. 1321, 168 A.L.R. 389.

While the plaintiff plead a breach of warranty stating that "because, of such warranty and guaranty plaintiff was induced to and did enter into such agreement", it afforded little notice, if any, as to the nature of its claim as to boilers and stay bolts. An amended pleading, in the light of the foregoing, should make its position more clear.